No. 23-1589

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

CANGREJEROS DE SANTURCE BASEBALL CLUB, LLC; SANTURCE
MERCHANDISING LLC; THOMAS J. AXON,

Plaintiffs-Appellants,

*v.*

LIGA DE BÉISBOL PROFESIONAL DE PUERTO RICO, INC.; CRIOLLOS
MANAGEMENT, INC.; RA12, INC.; INDIOS DE MAYAGÜEZ BASEBALL CLUB
INC.; GIGANTES DE CAROLINA BASEBALL CLUB INC.; LEONES DE PONCE CF
INC.; JUAN A. FLORES GALARZA, in his official and personal capacity;
IMPULSE SPORTS ENTERTAINMENT CORPORATION,

Defendants-Appellees,

CONJUGAL PARTNERSHIP FLORES-DOE; JANE DOE,

Defendants.

_____

On appeal from the U.S. District Court for the District of Puerto Rico
Case No. 3:22-cv-01341-WGY (Hon. William G. Young)

_____

## BRIEF OF APPELLANTS

Lauren Gailey
WINSTON & STRAWN LLP
1901 L Street, NW
Washington, DC 20036
(202) 282-5823

Jeffrey L. Kessler
Jeffrey J. Amato
Lauren E. Duxstad
Robert S. Pannullo
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-4698
JKessler@winston.com

(Additional counsel on inside cover)

Carlos A. Rodriguez-Vidal
GOLDMAN ANTONETTI &
   CORDOVA, LLC
P.O. Box 70364
San Juan, PR 00936
(787) 759-4117

*Counsel for Appellants Cangrejeros de Santurce Baseball Club, LLC,
Santurce Merchandising LLC, and Thomas J. Axon*

## RULE 26.1 DISCLOSURE STATEMENT

Thomas J. Axon is a natural person.  Cangrejeros de Santurce Baseball Club, LLC and Santurce Merchandising LLC are private non-governmental parties with no corporate parents, affiliates, or subsidiaries that are publicly held.

# TABLE OF CONTENTS

**Page**

RULE 26.1 DISCLOSURE STATEMENT.................................................. i

TABLE OF AUTHORITIES..................................................................v

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD.............. xi

INTRODUCTION .......................................................................1

JURISDICTIONAL STATEMENT......................................................5

STATEMENT OF THE ISSUES ......................................................6

STATEMENT OF THE CASE ..........................................................7

    A.   The League and its president lead a conspiracy to suppress competition in Puerto Rican baseball by suspending the Cangrejeros franchise's owner .....................7

    B.   Axon takes the League and its president to Superior Court to try to enjoin his suspension as a breach of the League's Constitution ..........................................11

    C.   The League conspires with its franchises and the Mayor of San Juan to unreasonably restrain trade and deprive Axon of his civil rights by permanently expelling Axon and seizing the Cangrejeros franchise........12

    D.   Plaintiffs sue the League and the teams for antitrust and civil rights violations in federal court, but the district court dismisses the complaint................................13

SUMMARY OF THE ARGUMENT.....................................................17

STANDARD OF REVIEW ..............................................................23

ARGUMENT...............................................................................24

I.   Plaintiffs' federal antitrust claims should not have been dismissed under the Federal Baseball antitrust exemption........24

A.    The discredited Federal Baseball exemption should not be expanded to cover a Puerto Rican baseball league that is not part of MLB ........................................................25

    1.    The Supreme Court has narrowed and criticized the exemption for decades ..........................................25

    2.    Even antitrust exemptions that are not discredited must be narrowly construed ....................30

    3.    The district court erred in expanding the Federal Baseball exemption to entities that are not part of MLB ..............................................................................31

B.    If the Federal Baseball exemption covered a league other than MLB, it would not apply here, as Defendants' anticompetitive conduct falls outside the narrow "business of baseball" ............................................36

    1.    The "business of baseball" only shields conduct "central" to organizing and operating a baseball league ...............................................................................37

    2.    The district court was wrong that Defendants' conspiracy to seize Plaintiffs' investor-operator interests satisfied the "business of baseball" requirement ................................................................39

II.    Plaintiffs' antitrust claims under Puerto Rico law are not preempted by the Supremacy Clause (or the Commerce Clause) ............................................................................43

III.    The district court erred in dismissing Plaintiffs' § 1983 claim on res judicata grounds ................................................................47

A.    There can be no perfect identity of claims, as the § 1983 claim arises from conduct that occurred after the Superior Court action and is based on a different and broader set of conspiratorial acts ..................................49

B.    There can be no perfect identity of parties given the six new defendants to this action, one of which did not exist when the Superior Court ruled...................................53

CONCLUSION..........................................................................57

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alston v. Town of Brookline,*
  997 F.3d 23 (1st Cir. 2021) ................................................................51

*Arbaugh v. Y&H Corp.,*
  546 U.S. 500 (2006) ........................................................................6

*Arecibo Radio Corp. v. Puerto Rico,*
  825 F.2d 589 (1st Cir. 1987) ..............................................................52

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .......................................................................23

*Baez-Cruz v. Municipality of Comerio,*
  140 F.3d 24 (1st Cir. 1998) ..............................................................52

*Belini v. Wash. Mut. Bank, FA,*
  412 F.3d 17 (1st Cir. 2005) ..............................................................57

*Berrios v. Gonzalez-Rosario,*
  630 F.3d 7 (1st Cir. 2010) ...............................................................56

*Boateng v. Interamerican Univ. Inc.,*
  210 F.3d 56 (1st Cir. 2000) ..............................................................51

*California v. ARC Am. Corp.,*
  490 U.S. 93 (1989) .....................................................................21, 46

*Charles O. Finley & Co., Inc. v. Kuhn,*
  569 F.2d 527 (7th Cir. 1978) .............................................................34

*Coors Brewing Co. v. Mendez-Torres,*
  562 F.3d 3 (1st Cir. 2009) ...............................................................55

*Cruz v. Melecio,*
  204 F.3d 14 (1st Cir. 2000) ...........................................................47, 53

*Diversified Foods, Inc. v. First Nat'l Bank*,
    985 F.2d 27 (1st Cir. 1993) ................................................................... 31

*Douglas v. Hirshon*,
    63 F.4th 49 (1st Cir. 2023) ........................................................... 23, 24

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990) ............................................................................. 46

*Fed. Baseball Club, Inc. v. Nat'l League of Prof'l Baseball
    Clubs*,
    259 U.S. 200 (1922) ............................................. 1, 25, 26, 27, 29

*Fed. Mar. Comm'n v. Seatrain Lines, Inc.*,
    411 U.S. 726 (1973) ........................................................................... 30

*Flood v. Kuhn*,
    407 U.S. 258 (1972) ........................... 1, 18, 28, 29, 31, 33, 37, 42, 44, 45

*Flood v. Kuhn*,
    443 F.2d 264 (2d Cir. 1971) .............................................................. 44

*Garber v. Off. of Comm'r of Baseball*,
    120 F. Supp. 3d 334 (S.D.N.Y. 2014) .................................................. 5

*Gener-Villar v. Adcom Grp., Inc.*,
    417 F.3d 201 (1st Cir. 2005) ............................................................. 50

*Glassie v. Doucette*,
    55 F.4th 58 (1st Cir. 2022) ................................................................ 24

*Grp. Life & Health Ins. Co. v. Royal Drug Co.*,
    440 U.S. 205 (1979) ........................................................................... 30

*Henderson Broad. Corp. v. Hous. Sports Ass'n, Inc.*,
    541 F. Supp. 263 (S.D. Tex. 1982) ....................................... 38, 40, 43

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ........................................................... 46

*Laumann v. NHL*,
    56 F. Supp. 3d 280 (S.D.N.Y. 2014) ...................................... 37, 40, 43

*Lochner v. New York,*
198 U.S. 45 (1905) ...............................................................26

*Mass. Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n,*
197 F.3d 560 (1st Cir. 1999).................................................46

*Mass. Sch. of Law v. Am. Bar,*
142 F.3d 26 (1st Cir. 1998).................................................51

*McCoy v. Major League Baseball,*
911 F. Supp. 454 (W.D. Wash. 1995)....................................5

*Migra v. Warren City Sch. Dist. Bd. of Educ.,*
465 U.S. 75 (1984) ...............................................................52

*Monagas v. de Arellano,*
674 F.3d 45 (1st Cir. 2012)....................................48, 50, 54

*Nat'l Broiler Mktg. Ass'n v United States,*
436 U.S. 816 (1978) .............................................................30

*NCAA v. Alston,*
141 S. Ct. 2141 (2021) ...............................19, 25, 27, 29, 33

*Nostalgic Partners, LLC v. Off. of Comm'r of Baseball,*
No. 22-2859 (2d. Cir.) ....................................................31, 38

*Nostalgic Partners, LLC v. Off. of Comm'r of Baseball,*
No. 21-10876 (S.D.N.Y) .................................................31, 34

*Patriot Cinemas, Inc. v. Gen. Cinema Corp.,*
834 F.2d 208 (1st Cir. 1987)................................................46

*Perez-Guzman v. Gracia,*
346 F.3d 229 (1st Cir. 2003)................................................55

*Pharm. Rsch. & Mfrs. of Am. v. Concannon,*
249 F.3d 66 (1st Cir. 2001)..................................................45

*Philip Morris Inc. v. Harshbarger,*
122 F.3d 58 (1st Cir. 1997)..................................................46

vii

*Piazza v. Major League Baseball*,
  831 F. Supp. 420 (E.D. Pa. 1993) .................................................33, 40

*Postema v. Nat'l League of Prof'l Baseball Clubs*,
  799 F. Supp. 1475 (S.D.N.Y. 1992).......................................37, 38, 40

*Puerto Ricans for P.R. Party v. Dalmau*,
  544 F.3d 58 (1st Cir. 2008) ...............................................................47

*Richards v. Jefferson County*,
  517 U.S. 793 (1996) ..........................................................................56

*Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*,
  87 F. Supp. 3d 874 (N.D. Ill. 2015)...................................34, 40, 41, 42

*Sackett v. EPA*,
  598 U.S. 651 (2023) ..........................................................................26

*State Oil Co. v. Kahn*,
  522 U.S. 3 (1997) ..............................................................................28

*Toolson v. N.Y. Yankees, Inc.*,
  346 U.S. 356 (1953) .....................................................28, 34, 36, 37

*Tri-City ValleyCats, Inc. v. Off. of Comm'r*,
  No. 23-283 (U.S.) ..............................................................................43

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
  512 F.2d 1264 (9th Cir. 1975)............................................................40

*Union Lab. Life Ins. Co. v. Pireno*,
  458 U.S. 119 (1982) ..........................................................................30

*W. Coast Hotel Co. v. Parrish*,
  300 U.S. 379 (1937) ..........................................................................26

*Walsh v. Int'l Longshoremen's Ass'n*,
  630 F.2d 864 (1st Cir. 1980)...............................................................50

*Whole Women's Health v. Hellerstedt*,
  579 U.S. 582 (2016) ..........................................................................51

*Wyckoff v. Off. of Comm'r of Baseball*,
    211 F. Supp. 3d 615 (S.D.N.Y. 2016)....................................34, 40, 42

**Statutes**

15 U.S.C. §§ 1–2 (Sherman Act) ...............................................................13

28 U.S.C. § 1291 ..........................................................................................5

28 U.S.C. § 1331 ..........................................................................................5

28 U.S.C. § 1337 ..........................................................................................5

28 U.S.C. § 1367 ..........................................................................................5

42 U.S.C. § 1983 ........................................................................................14

P.R. Laws Ann. tit. 10, § 259 ...................................................................14

P.R. Laws Ann. tit. 10, § 260 ...................................................................14

P.R. Laws Ann. tit. 31, § 10801 ...............................................................14

P.R. Laws Ann. tit. 31, § 10803 ...............................................................14

**Other Authorities**

1st Cir. R. 34.0(a) ..................................................................................... xi

David Adler, *Clemente Tops List of Greatest Players from PR*,
    MLB.com (Sept. 9, 2020) .....................................................................7

Fed. R. Civ. P. 12(b)(1) .............................................................................15

Fed. R. Civ. P. 12(b)(6)...................................................................6, 15, 23

Fed. R. Civ. P. 12(g)(2)..............................................................................15

Hon. Samuel A. Alito, Jr., *The Origin of the Baseball
    Antitrust Exemption:* Federal Baseball Club of Baltimore,
    Inc. v. National League of Professional Baseball Clubs,
    34 J. Sup. Ct. Hist. 183 (2009) ..........................................................25

*Puerto Rican Winter League Honors Roberto Clemente with New Logo*, SportsLogos.net (Sept. 29, 2021)......................................35

Restatement (Second) of Judgments § 24, cmt. f (1980).........................51

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Oral argument should be heard in this case. *See* 1st Cir. R. 34.0(a). This appeal raises a question of first impression in this circuit regarding the scope and application of an antiquated judicially created exemption from federal antitrust law. It also involves complex legal questions pertaining to the district court's application of the Supremacy Clause and the res judicata doctrine. Oral argument would further clarify these issues and aid the court in resolving them.

## INTRODUCTION

In the opening line of the decision below, the district court candidly admitted that it was "boldly go[ing] where no lower court has gone before" by expanding the narrow antitrust exemption the Taft Court carved out for "base ball" to extend beyond the confines of Major League Baseball ("MLB") and its Minor Leagues.  ADD2;[1] *Fed. Baseball Club, Inc. v. Nat'l League of Prof'l Baseball Clubs*, 259 U.S. 200, 208–09 (1922).  For a century, those have been the only organizations to which the exemption has ever applied.  In the decades since *Federal Baseball*, the Supreme Court has severely criticized and narrowed the exemption, confining it to its facts, refusing to extend it to other sports, and, most recently, casting doubt on its very existence.  The Court has called the exemption "aberra[nt]," "anomal[ous]," "unrealistic," "inconsistent," and "illogical" (*Flood v. Kuhn*, 407 U.S. 258, 282 (1972) (quotation omitted))—the very opposite of an exemption that courts should interpret broadly and extend.

The district court recognized that the *Federal Baseball* exemption was "much criticized."  ADD2.  And yet it read this critical case law as a

---

[1] "ADD" refers to the addendum appended to this brief.

1

directive to expand it—for the first time—to a "professional baseball venture NOT associated with Major League Baseball": Liga de Béisbol Profesional de Puerto Rico, Inc. (the "League"), Puerto Rico's top-tier professional baseball league.  ADD3.  The district court also applied the exemption to shield anticompetitive conduct far outside the "business of baseball"—the narrow range of "central" league activities requiring joint action that the *Federal Baseball* exemption is limited to.

In 2019, Thomas J. Axon purchased a controlling interest in one of the League's six franchises, the Cangrejeros de Santurce, based in San Juan (the "Cangrejeros franchise").  The once-storied Cangrejeros had fallen on hard times, and Axon dreamed of restoring the franchise to glory by attracting better players with higher salaries, broadcasting games to a wider audience, and modernizing the team's stadium.  The League, however, resisted this increased competition, which violated a gentlemen's agreement by the teams not to compete on economic terms with such vigor.

The League first fined and suspended Axon, and when he fought the sanctions as a breach of the League's Constitution in the Puerto Rico Court of First Instance, Superior Court of San Juan ("Superior Court")

and lost, the League then conspired with the other franchises and the Mayor of San Juan to oust Axon entirely and seize his ownership of the Cangrejeros franchise—suppressing competition and taking his property without due process.

This was the conspiracy in restraint of trade that the district court held should be shielded from the federal antitrust laws under an unprecedented expansion of the *Federal Baseball* exemption to entities that were not part of Major League Baseball and to conduct that was far outside the narrow "business of baseball."

After dismissing Plaintiffs' federal antitrust claims, the district court compounded its error by dismissing their Puerto Rico antitrust and unfair competition claims as preempted and their federal civil rights claim (for the illegal deprivation of Axon's ownership of the Cangrejeros franchise) on res judicata grounds. Each of these rulings misapplied controlling law and misconstrued the undisputed facts.

The district court wrongly found that it was obligated to dismiss the Puerto Rico antitrust and unfair competition claims once the federal antitrust claims were dismissed. The district court's conclusion that the Puerto Rico claims were preempted under the Supremacy Clause relied

on a case decided under the *Commerce* Clause (which does not apply here because the challenged conduct only took place in Puerto Rico) and ignored Supreme Court precedent permitting states to impose antitrust liability beyond what federal law authorizes. Plaintiffs' Puerto Rico claims are not preempted.

The district court also erred in dismissing Plaintiffs' federal civil rights claim as precluded under the doctrine of res judicata by Axon's earlier suit in the Superior Court. Under governing Puerto Rico law, res judicata requires perfect identity of claims and parties, and neither existed here. The two claims were very different: the Superior Court action involved a breach of contract challenge under the League's Constitution to Axon's fine and suspension by the League and its president, whereas the § 1983 civil rights claim arose from a broad conspiracy involving all of the franchises, the League, and the Mayor of San Juan to seize the Cangrejeros franchise, depriving Plaintiffs of their property without due process. This seizure did not take place until after the Superior Court action was completed. The much broader post-Superior Court conspiracy challenged by the federal § 1983 claim thus necessarily could not have been adjudicated in the Superior Court action. Moreover, the parties to

the two actions were different and not in privity with each other. One of the new defendants in the civil rights action—the entity that took over Axon's seized interest in the Cangrejeros franchise—did not even exist until two weeks *after* the Superior Court decision. Res judicata simply does not apply in these circumstances.

The decision below should be reversed in its entirety.

## JURISDICTIONAL STATEMENT

The district court dismissed Plaintiffs' complaint on June 27, 2023. JA11.[2] Plaintiffs timely appealed on June 30, 2023. JA11–12. This Court has jurisdiction under 28 U.S.C. § 1291, and the district court had jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367.

Although Plaintiffs' federal antitrust claims were purportedly dismissed on jurisdictional grounds, there is no jurisdictional issue in play. Courts have recognized that "the scope of the baseball exemption is *not a jurisdictional issue*"—"[i]t is a threshold merits issue." *Garber v. Off. of Comm'r of Baseball*, 120 F. Supp. 3d 334, 339 (S.D.N.Y. 2014) (emphasis added); *see, e.g.*, *McCoy v. Major League Baseball*, 911 F. Supp. 454, 456–

---

[2] "JA" refers to the parties' Joint Appendix.

57 (W.D. Wash. 1995) (dismissing under Rule 12(b)(6)). This is an instance in which subject matter jurisdiction "in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant [is] bound by the federal law asserted as the predicate for relief—a merits-related determination." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006).

## STATEMENT OF THE ISSUES

1.  Whether the narrow, disfavored *Federal Baseball* exemption from federal antitrust law should be (A) extended, for the first time, beyond MLB and its affiliates, and (B) applied to conduct outside "the business of baseball." Alternatively, whether the *Federal Baseball* exemption remains good law.[3]

2.  Whether the Sherman Act preempts Plaintiffs' Puerto Rico antitrust and unfair competition claims under the Supremacy Clause (or the Commerce Clause).

---

[3] Plaintiffs recognize that if this Court construes the *Federal Baseball* exemption broadly enough to cover the unique facts of this case, *Federal Baseball* must be followed unless and until it is overruled by the Supreme Court. Plaintiffs thus present this alternative version of the question presented to preserve it for possible Supreme Court review.

3.  Whether res judicata bars Plaintiffs' § 1983 due process claim when (A) it is not the same as or similar to the breach-of-contract claim litigated in the earlier Superior Court action—the deprivation of property did not even occur until after the Superior Court action concluded—and (B) the § 1983 claim is asserted against new parties that were not in privity with the parties to the Superior Court action.

## STATEMENT OF THE CASE

### A.   The League and its president lead a conspiracy to suppress competition in Puerto Rican baseball by suspending the Cangrejeros franchise's owner.

Puerto Rico is well known for "giv[ing] Major League Baseball some of the best players in the game today" as well as "some of the great players of the past—some of the greatest to ever play the game, in fact." David Adler, *Clemente Tops List of Greatest Players from PR*, MLB.com (Sept. 9, 2020), https://perma.cc/B6PU-L5K5.  Generations of baseball legends, from Roberto Clemente and Orlando Cepeda to Iván Rodríguez and Roberto Alomar, hail from the Commonwealth, as do current MLB superstars like Javier Báez, Francisco Lindor, and Carlos Correa.  *Id.* But Puerto Rico is not merely an unusually rich talent pool of baseball

players. Professional baseball is big business *in* Puerto Rico as well, in a league that is not part of MLB.

Liga de Béisbol Profesional de Puerto Rico, Inc. is Puerto Rico's only top-tier professional baseball league. *See* JA14. Although the League is part of a confederation of Caribbean leagues that has entered into a Winter League Agreement with MLB that allows MLB players to play in the Caribbean leagues in the offseason, those leagues and their teams—including the League and its franchises—are *not* affiliates of MLB. JA23–24; *see also* JA150 ("[E]ach Winter League is not and shall be not considered to be a Minor League.").

The League consists of six franchise teams (the Criollos de Caguas, Cangrejeros de Santurce, Gigantes de Carolina, Indios de Mayagüez, Leones de Ponce, and RA12), each of which is operated by separately owned investors. JA23–24; *see* JA150. In October 2019, Thomas Axon, through a limited liability company called Cangrejeros de Santurce Baseball Club, LLC ("Cangrejeros LLC"), purchased operating control of the Cangrejeros franchise, based in San Juan. JA14–15. Despite its history as one of the most storied franchises in Puerto Rican baseball, the Cangrejeros franchise, like the League itself, had fallen on hard times. *Id.* Fewer teams

participated in the League's season, attendance was down, and stadiums had fallen into disrepair. *Id.*

But Axon had a vision: to restore the Cangrejeros franchise to glory by competing economically with the other teams to improve the quality of players, stadiums, sponsors, and broadcasters. *Id.* To make this dream of improved competition a reality, Axon invested in initiatives such as broadcasting games on the Fox Sports Network in the continental United States, commissioning a documentary film about the League, offering higher salaries to attract better players, and directing roughly $2 million toward a proposal to revitalize the Cangrejeros franchise's stadium, which was managed and financed by the City of San Juan. JA15, JA20–21, JA28. Cangrejeros merchandise also began to generate significant revenue—so much that the franchise entered into a deal with the prominent sports-apparel retailer Lids. JA27.

The League and the other franchise owners should have applauded Axon's efforts. But they abhorred the economic competition. The League and the other franchise owners feared that the other clubs would lose ground to the Cangrejeros franchise and that they would have to expend additional resources to try to keep up. JA15, JA20–21. They also feared

that Axon would move the team from San Juan to another municipality, which was opposed by the Mayor of San Juan, and which would lead to increased competition in stadium investments by the teams. *Id.*

After Axon publicly advocated for improvements to the Cangrejeros' stadium, vowed to invest millions of dollars toward that effort, and indicated that he would consider moving the team to another city if the San Juan stadium could not be renovated, the League's president, Juan A. Flores Galarza, accused Axon of engaging in conduct "detrimental to baseball" in violation of Section 8.02 of the League Constitution. JA30 (quotation omitted); *see also* JA108–09 (reprinting relevant provision). Axon challenged Flores's assertions and asked to attend the special meeting of the League's board that Flores had called to discuss possible sanctions against Axon. JA31.

Despite this request, the board—made up of the competing investor-operators who controlled the League's other franchises—met without Axon. *Id.* They conspired to suppress his competition by agreeing with Flores that the League should suspend Axon from any participation in the Cangrejeros franchise and the League for two years, and place him on probation for an additional year after the suspension expired. *Id.*

10

**B.    Axon takes the League and its president to Superior Court to try to enjoin his suspension as a breach of the League's Constitution.**

In an effort to prevent his suspension from taking effect, Axon (and Cangrejeros LLC) sought a preliminary injunction and declaratory judgment in the Superior Court of San Juan.  JA31–32, JA79–99.  The suit was narrowly focused: it asserted that the League and its president, Flores, breached the League's Constitution by imposing the suspension.  *See* JA86–88 (alleging various constitutional breaches).  The only defendants in the suit were the League and President Flores.  *See* JA80–81.

On May 5, 2022, the Superior Court denied the motion for preliminary injunctive relief.  *See* JA111.  The court determined that because Axon was not, as defined by the League Constitution, "the Permanent Delegate or the Alternate Delegate who represents the [Cangrejeros] franchise on the Board," he was "not a member of the . . . League" and therefore did not have standing to seek relief before the court for breach of the Constitution.  JA110; *see* JA32.  No other issues were raised or resolved before the Superior Court.

**C.  The League conspires with its franchises and the Mayor of San Juan to unreasonably restrain trade and deprive Axon of his civil rights by permanently expelling Axon and seizing the Cangrejeros franchise.**

After the decision in the Superior Court action, Flores and the League engaged in new conspiratorial acts designed to eliminate Axon as an economic competitor once and for all. They plotted with the other franchises, as well as a co-conspirator who would buy the franchise seized from Axon, to oust Axon from ownership of the Cangrejeros franchise entirely. JA28. This conspiracy was carried out with the participation and support of the Mayor of San Juan, Miguel Romero Lugo, acting under the color of law, who did not want to expend resources on renovating the stadium for the Cangrejeros franchise but also did not want it to move to another city. *See* JA15, JA20–21, JA32–33.

On May 17, two weeks after the Superior Court action was completed, Flores informed Axon that the League was permanently seizing Cangrejeros LLC's investor-operator interests in the Cangrejeros franchise. JA32. The League's other franchises all participated in this scheme, supported by Mayor Romero Lugo, to seize Axon's and Cangrejeros LLC's rights in the Cangrejeros franchise—without any due process or compensation. JA33–34.

The League then announced that co-conspirator Impulse Sports, which had just been formally incorporated on May 20, would become the new investor-operator of the seized Cangrejeros franchise. JA15–16, JA32–34. The League and the other investor-operators knew that, unlike Axon and Cangrejeros LLC, Impulse Sports would adhere to the gentlemen's agreement not to compete aggressively for players and fans with the other teams in the League. JA32–34. When Impulse Sports was introduced as the new investor-operator of the Cangrejeros franchise on July 7, 2022, Mayor Romero Lugo took part in the announcement to celebrate the change to an investor-operator that would not press for stadium improvements or threaten to move the team from San Juan. JA35.

**D. Plaintiffs sue the League and the teams for antitrust and civil rights violations in federal court, but the district court dismisses the complaint.**

Axon, Cangrejeros LLC, and Santurce Merchandising LLC, a company Axon formed to manage the franchise's marketing efforts (collectively, "Plaintiffs"), filed the instant case: a seven-count complaint in the District of Puerto Rico asserting antitrust claims under Sherman Act §§ 1 (unreasonable restraint of competition) and 2 (conspiracy to monopolize), 15 U.S.C. §§ 1–2, and the equivalent provisions of Puerto Rico antitrust

law (P.R. Laws Ann. tit. 10, § 260); a violation of Puerto Rico's unfair competition and consumer deception laws (P.R. Laws Ann. tit. 10, § 259; P.R. Laws Ann. tit. 31, §§ 10801, 10803); the tort of "contracts in prejudice of a third person," which is similar to tortious interference; and a claim under 42 U.S.C. § 1983 alleging violations of Axon's civil rights to not have his property interests seized without due process of law in a conspiracy supported by the Mayor of San Juan. JA42–53; *see* JA18.

Unlike the Superior Court action, which only challenged Axon's temporary suspension as a breach of the League's Constitution, Plaintiffs here challenged Defendants' far-reaching conspiracy in restraint of trade and a civil rights conspiracy to deprive Axon of his property without due process of law. These new conspiracy claims centered upon the seizure of Axon's investor-operator interest in the Cangrejeros franchise—a conspiratorial act that did not even take place until after the Superior Court action ended. In addition to the League and Flores, who were the only defendants in the Superior Court action, the investor-operators of all of the other franchises were named as defendants in the federal court action: Criollos Management, Inc.; RA12, Inc.; Indios de Mayagüez Baseball Club Inc.; Gigantes de Carolina Baseball Club Inc.; Leones de Ponce

CF Inc.; and Impulse Sports, the new investor-operator of the seized Cangrejeros franchise (collectively, the "Franchise Defendants").

The League, later joined by some of the Franchise Defendants, moved to dismiss under Rule 12(b)(6), arguing that the parties' agreements obligated Plaintiffs to litigate their claims in Puerto Rico Superior Court, and that the claims were barred by res judicata based on the denial of the preliminary injunction in the Superior Court action.  JA7–8; *see also* ECF 28 at 1–2.[4]  Six weeks later, the Franchise Defendants (but not the League or Flores) filed *another* motion to dismiss, this time under Rule 12(b)(1) as well as 12(b)(6).  JA8–9; *see* ECF 43.  In this motion, the Franchise Defendants argued that: (1) Plaintiffs' federal antitrust claims should be dismissed based on the *Federal Baseball* exemption; and (2) the remaining Puerto Rico law claims should be dismissed either because they were preempted under the Supremacy Clause, barred by the Commerce Clause, or failed as a matter of law without the antitrust claims as a predicate.  ECF 43 at 10–15.

Plaintiffs moved to strike the second motion to dismiss as barred by Rule 12(g)(2) of the Federal Rules of Civil Procedure, but the court denied

---

[4] "ECF" citations refer to the district court docket.

the motion, instead treating the second dismissal motion "as a motion for reconsideration." JA9–11. After hearing oral argument on the motions to dismiss, the court dismissed all seven of Plaintiffs' claims. JA11.

The district court first dismissed the federal antitrust claims on the ground that "the antitrust exemption applies to professional baseball" generally—not just to MLB and its affiliates—thus becoming the first court to "appl[y] the Supreme Court's much criticized judicial exemption to the Nation's antitrust laws to a . . . professional baseball venture NOT associated with Major League Baseball." ADD2–3, ADD15. The court then "consequently dismissed" Plaintiffs' Puerto Rico antitrust and unfair competition claims "based on the Supremacy Clause." ADD19.

The district court also dismissed Plaintiffs' § 1983 claim after concluding that the Superior Court action "preclude[d] the [§ 1983] claim through the doctrine of res judicata." ADD27. It reached this conclusion even though the seizure of Axon's investor-operator interest in the Cangrejeros franchise—the basis of the § 1983 claim—did not occur until *after* the Superior Court action. ADD25. And despite the assertion of entirely different claims and the addition of six new defendants, one of whom (Impulse Sports) did not exist at the time of the Superior Court

16

action, the district court still determined that there was sufficient identity of the causes of action and sufficient privity between the parties to conclude that the § 1983 claims were barred by res judicata.  ADD27.

Having dismissed all of Plaintiffs' federal claims, the court declined to exercise supplemental jurisdiction over the remaining Puerto Rico law claims.  ADD29.  It granted both motions to dismiss (*id.*), and Plaintiffs timely appealed.  JA209–11.

## SUMMARY OF THE ARGUMENT

I.    The district court erred in dismissing Plaintiffs' federal antitrust claims under the exemption the Supreme Court created more than a century ago in *Federal Baseball*.  To reach the conclusion that Defendants' conduct "falls squarely within the core of baseball's antitrust exemption" (ADD12), the district court had to expand the much-criticized exemption in two ways—neither of which is supported by existing law.

*First*, the district court erred in extending the "Supreme Court's much criticized judicial exemption" to a "professional baseball venture NOT associated with Major League Baseball."  ADD2–3.  The court correctly recognized that the League and its franchises were not part of

17

MLB. And it also observed that the Supreme Court has repeatedly narrowed and criticized the exemption, which arose in a legal context involving a limited view of interstate commerce that has long since been abandoned. And yet the district court latched on to just a few phrases in the case law—and ignored the fact that those cases (and every other case applying the exemption since *Federal Baseball*) only involved MLB or its Minor Leagues—to conclude that this "aberrational," "illogical," and outdated exemption should be expanded to apply to a league and teams that are not part of MLB. This unwarranted expansion of the exemption violates the principle that antitrust exemptions are to be narrowly construed. Indeed, the only reason the exemption still exists is that the Supreme Court previously found that MLB had justifiably relied upon the continuation of the exemption under principles of stare decisis. *See Flood*, 407 U.S. at 282. That rationale does not apply to entities outside MLB that, in one hundred years, never had reason to believe they would be covered by the exemption.

*Second*, even if the *Federal Baseball* exemption could be expanded to apply to a league and its franchises that are not affiliates of MLB, it

would not apply to the conduct at issue here: an anticompetitive conspiracy that goes far beyond the limited "business of baseball" that the exemption covers. The "business of baseball" language from *Federal Baseball* and its progeny has been read and applied narrowly, to refer only to activities that are "central" to operating a baseball league, such as the system for signing and compensating players, the size of the field, and the rules of the game. The district court, however, wrongly took an enormously expansive view of the exemption to conclude that virtually any conduct a baseball league and its teams could engage in, including a conspiracy to drive one of its owners out of business to suppress competition, qualified as the "business of baseball." ADD19. This is far beyond the narrow scope of *Federal Baseball*.

While this Court cannot overrule the anomalous *Federal Baseball* exemption, it should not permit it to be expanded to cover entities and conduct far outside of its limited bounds. Just two years ago, the Supreme Court once again heavily criticized the exemption and made it clear that there was no basis for extending it, in that case, to college sports. *See NCAA v. Alston*, 141 S. Ct. 2141, 2159 (2021). By expanding this most vilified antitrust exemption, the district court departed from

the fundamental principle that all antitrust exemptions must be narrowly construed. This Court should reverse that unprecedented ruling.[5]

II.    The district court also erred by "consequently" dismissing Plaintiffs' Puerto Rico antitrust and unfair competition claims on the ground that they are preempted under the Supremacy Clause. To begin with, the district court misread *Flood*, which did not address the Supremacy Clause. That case dealt with the implications under the *Commerce Clause* for applying differing state antitrust laws to MLB's reserve clause, which governed its nationwide system for signing players. But, in that context, there was an obvious need for national uniformity to avoid unduly burdening MLB's nationwide player rules. The Commerce Clause analysis is entirely different in this case, where the challenged conduct by the League and its franchises took place exclusively in Puerto Rico, and there is no risk of inconsistent state antitrust laws imposing conflicting obligations. There is thus no basis to find that the decision in

---

[5] If this Court were to affirm the application of the *Federal Baseball* exemption here, Plaintiffs would seek Supreme Court review. Accordingly, Plaintiffs preserve the argument that the *Federal Baseball* exemption should be overturned as wrongly decided and inconsistent with modern antitrust and Commerce Clause jurisprudence.

*Flood* precludes the application of Puerto Rico antitrust law to the challenged conspiracy here, which only had an impact on Defendants' operations in Puerto Rico.

Nor is there any basis for dismissing Plaintiffs' Puerto Rico antitrust claims under the Supremacy Clause, even if the *Federal Baseball* exemption shielded Defendants from the federal antitrust laws. The Supreme Court has made clear that state antitrust laws may impose a higher standard of antitrust liability than the federal antitrust laws without being preempted under the Supremacy Clause. *See California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989) ("Ordinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law" without a clear purpose of Congress indicating otherwise (citations omitted)).

III.    The district court further erred in dismissing Plaintiffs' § 1983 claim on the ground that it was precluded by res judicata. Under controlling Puerto Rico law, res judicata requires a perfect identity of both claims and parties between the earlier and later actions, and neither is present here.

The district court erroneously found sufficient identity between Axon's attempt to block his suspension in Puerto Rico Superior Court and the § 1983 claim in this case because, among other things, it conflated Axon's suspension by Flores and the League with his subsequent termination from—and deprivation of his interest in—the Cangrejeros franchise. These actions were not the same. Indeed, the § 1983 claim arose from conspiratorial acts that did not take place until after the Superior Court action and thus, as a matter of law, could not be barred by res judicata. Nor was the breach of contract claim in the Superior Court action, which was asserted against only Flores and the League and was denied for lack of standing, remotely similar to the broad civil rights conspiracy claim asserted against Flores, the League, and the Franchise Defendants for conspiring with the Mayor of San Juan to deprive Plaintiffs of their investor-operator interests in the Cangrejeros franchise without due process. Because the claims are not the same, or even substantially similar, in the two actions, res judicata does not apply.

Res judicata also does not apply for the additional reason that there was neither an identity of parties between the Superior Court action and this case, nor sufficient privity between them. Only Flores and the

League were defendants in the Superior Court action, as they were the parties who breached the League's Constitution to suspend Axon. By contrast, the civil rights conspiracy claim here involves an additional plaintiff and six new Franchise Defendants. One of these new defendants, Impulse Sports, which played a pivotal role in the civil rights conspiracy, did not even exist until two weeks after the Superior Court action. These new parties could not have been in privity with the parties to the Superior Court action with respect to a claim directed at conspiratorial acts that did not take place until after the Superior Court action concluded.

Because the federal antitrust and civil rights claims should not have been dismissed, there was no basis for the district court to dismiss the remaining state law claims for lack of supplemental jurisdiction. The decision below should thus be reversed in its entirety.

## STANDARD OF REVIEW

This Court reviews an order granting a motion to dismiss—whether for failure to state a claim or for lack of subject matter jurisdiction—de novo. *See Douglas v. Hirshon*, 63 F.4th 49, 54–55 (1st Cir. 2023) (applying same legal standard as district court—facial plausibility—in reviewing 12(b)(6) dismissal (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)));

*Glassie v. Doucette*, 55 F.4th 58, 65 (1st Cir. 2022). In either case, this Court accepts well-pled facts as true and draws all inferences in the non-movant's favor. *Douglas*, 63 F.4th at 55; *Glassie*, 55 F.4th at 65.

## ARGUMENT

### I. Plaintiffs' federal antitrust claims should not have been dismissed under the *Federal Baseball* antitrust exemption.

In dismissing Plaintiffs' federal antitrust claims, the district court became the first court to extend the "Supreme Court's much criticized judicial exemption" to a "professional baseball venture NOT associated with Major League Baseball." ADD2–3. But "boldly go[ing] where no lower court has gone before" (ADD2) was improper in this case for at least two reasons.

*First*, as a disfavored antitrust exemption, the *Federal Baseball* exemption should not have been expanded to apply, for the first time in its one-hundred-year history, to a league and teams that are not affiliates of MLB. Only MLB and its Minor Leagues can rightfully claim the "reliance" interest that was used in *Flood* to justify continuing the discredited exemption.

*Second*, it was error to expand the narrow reach of the exemption beyond the "business of baseball"—which only covers conduct central to

the operation of a baseball league—to shield a broad-based conspiracy to suppress competition and seize Plaintiffs' franchise, which had nothing to do with the type of conduct (such as rules for signing players) that is central to the League's operations. Expanding the exemption is inconsistent with Supreme Court authority, including the recent *Alston* decision, where a unanimous Supreme Court expressed contempt for, and refused to extend, the *Federal Baseball* exemption and cast doubt on its continued existence. *See* 141 S. Ct. at 2159.

## A.    The discredited *Federal Baseball* exemption should not be expanded to cover a Puerto Rican baseball league that is not part of MLB.

### 1.    The Supreme Court has narrowed and criticized the exemption for decades.

More than a century ago, in a case against MLB's predecessor leagues, the Supreme Court created a federal antitrust exemption for "the business . . . of base ball." *See Federal Baseball*, 259 U.S. at 208; *see also* Hon. Samuel A. Alito, Jr., *The Origin of the Baseball Antitrust Exemption:* Federal Baseball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs, 34 J. Sup. Ct. Hist. 183, 185 (2009). That decision, however, was based on an anachronistic and extremely narrow

view of interstate commerce that cannot be reconciled with modern juris-prudence.

Specifically, the Court reasoned that while baseball teams travel from one state to another to play games, such "transport is a mere inci-dent" and not "essential" to playing the games themselves. *Federal Base-ball*, 259 U.S. at 208–09. Interstate commerce was thus found not to be implicated, and the federal antitrust laws could not be applied. *Id.* at 209. This ultra-restrictive interpretation of the Commerce Clause was abandoned by the subsequent case law that overturned the notorious *Lochner v. New York* decision and rejected challenges to the many inter-state programs the New Deal ushered in.[6] Under the modern view of the Commerce Clause, there could be no doubt that a sports league was en-gaged in interstate commerce and that the federal antitrust laws should therefore be applied to its operations.

---

[6] 198 U.S. 45 (1905); *see Sackett v. EPA*, 598 U.S. 651, 696 (2023) (Thomas, J., concurring) ("In the New Deal era . . . this Court adopted a greatly expanded conception of Congress' commerce authority by permitting Congress to regulate any private intrastate activity that substantially affects interstate commerce, either by itself or when aggregated with many similar activities" (citing *Wickard v. Filburn*, 317 U.S. 111, 127–29 (1942))); *see, e.g.*, *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 397–99 (1937) (overruling *Lochner* in upholding law regulating wages and work-ing hours).

It was thus not surprising that after the New Deal, the Supreme Court made it clear that it was not going to expand the exemption recognized in *Federal Baseball* outside of MLB. In *Radovich v. National Football League*, for example, the Supreme Court applied the antitrust laws to the NFL and "specifically limit[ed] the rule" of *Federal Baseball* "to the facts there involved." 352 U.S. 445, 451 (1957). It reached the same result in *United States v. International Boxing Club*, applying the antitrust laws to the professional boxing business. 348 U.S. 236, 242 (1955) ("*Federal Baseball* could not be relied upon as a basis of exemption for other segments of the entertainment business, athletic or otherwise."). Most recently, the Supreme Court in *Alston* held that the college sports business was fully subject to the antitrust laws and reiterated that it has "refused to extend Federal Baseball's reasoning to other sports leagues." 141 S. Ct. at 2159.

The only reason the Supreme Court has continued to apply the *Federal Baseball* exemption to MLB is because of stare decisis, the failure of Congress to take action to reverse the exemption, and the resulting reliance of MLB on the exemption in structuring its central operations, especially its reserve clause limiting competition for players. *See Toolson*

27

*v. N.Y. Yankees, Inc.*, 346 U.S. 356 (1953); *Flood*, 407 U.S. 258.  By the

time *Flood* was decided, the Court expressly acknowledged that the *Fed-*

*eral Baseball* exemption was "illogical" as there could no longer be any

doubt that the business of baseball involved interstate commerce.  *See*

*Flood*, 407 U.S. at 279, 282 ("Professional baseball is a business and it is

engaged in interstate commerce."); *see also Toolson*, 346 U.S. at 357–58

(Burton, J., dissenting) ("Whatever may have been the situation when

the Federal Baseball Club case was decided in 1922 . . . it is a contradic-

tion in terms to say that the defendants in the cases before us are not

now engaged in interstate trade or commerce").  The Supreme Court in

*Flood* further maligned the exemption as "unrealistic," "inconsistent," an

"aberration," an "exception," and an "anomaly."  407 U.S. at 282 (quoting

*Radovich*, 352 U.S. at 452).  However, it permitted the exemption to

stand because, absent contrary congressional action, it found that MLB

had reasonably relied upon the exemption's continued existence.[7]  *Id.* at

282–84; *Toolson*, 346 U.S. at 357 ("The business has . . . been left for

---

[7] *See Flood*, 407 U.S. at 283 ("Congress as yet has had no intention to
subject baseball's reserve system to the reach of the antitrust statutes.");
*but see State Oil Co. v. Kahn*, 522 U.S. 3, 19 (1997) ("we infer little mean-
ing from the fact that Congress has not reacted legislatively").

thirty years to develop, on the understanding that it was not subject to existing antitrust legislation.").

Most recently, however, the Supreme Court in *Alston* called into question whether it would continue to recognize the exemption even for MLB, given the decision's unsound reasoning and outdated jurisprudential underpinnings. *See* 141 S. Ct. at 2159 ("[T]his Court *once dallied* with something that *looks a bit like* an antitrust exemption for professional baseball." (emphases added)). The *Alston* Court cited past criticisms of the exemption and refused to extend it to shield the NCAA's anticompetitive agreements in college sports. *See id.* (citing *Federal Baseball*, *Flood*, and *Radovich*).

In light of these precedents, it was legal error for the district court to expand the discredited *Federal Baseball* exemption to a league and teams that were not part of MLB and thus could not reasonably have had any reliance interest in the exemption's application. The illogical, anachronistic exemption should not have been extended to a league that is not part of MLB, and thus allowed to do further harm to competition and antitrust policy. Like the NCAA in *Alston*, the League "is not above the law." *Id.* at 2169 (Kavanaugh, J., concurring).

### 2. Even antitrust exemptions that are not discredited must be narrowly construed.

The Supreme Court has repeatedly emphasized the "well settled" principle "that exemptions from the antitrust laws are to be narrowly construed." *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979); *Union Lab. Life Ins. Co. v. Pireno*, 458 U.S. 119, 126 (1982) (antitrust exemptions "must be construed narrowly"); *Fed. Mar. Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 733 (1973) (broad construction "would conflict with [the Court's] frequently expressed view that exemptions from antitrust laws are strictly construed"). Because this limiting principle applies to all antitrust exemptions, it follows, *a fortiori*, that it must be applied with particular force to the heavily criticized and illogical *Federal Baseball* exemption.

Further, because "[s]pecific exemptions are the product of rough political accommodations responsive to the time and current conditions," they should not be divorced from the context in which they arose and the purpose they were intended to serve. *Nat'l Broiler Mktg. Ass'n v United States*, 436 U.S. 816, 836–37 (1978) (Brennan, J., concurring). "If the passage of time has 'antiquated' the premise upon which that compromise was struck, the exemption should not be judicially reincarnated in

30

derogation of the enduring national policy embodied in the Sherman Act."
*Id.*

Recognizing these core principles of antitrust jurisprudence, the Department of Justice's Antitrust Division has said on multiple occasions that the *Federal Baseball* exemption "does not rest on any substantive policy interests" and "was not created to reconcile competing legal authorities or substantive policy goals." Statement of United States at 1, 6, *Nostalgic Partners, LLC v. Off. of Comm'r of Baseball*, No. 21-10876 (S.D.N.Y. June 15, 2022), ECF 35 ("DOJ Statement of Interest"); *see* Brief for the United States as Amicus Curiae at 10, *Nostalgic Partners, LLC v. Off. of Comm'r of Baseball*, No. 22-2859 (2d. Cir. Jan. 30, 2023), ECF 68 ("DOJ Amicus Brief"). For these reasons, the DOJ has urged the courts not to expand the application of the exemption beyond its very narrow premise.

> **3. The district court erred in expanding the *Federal Baseball* exemption to entities that are not part of MLB.**

As this Court has observed, the *Federal Baseball* exemption "persists but is not extended." *Diversified Foods, Inc. v. First Nat'l Bank*, 985 F.2d 27, 30 (1st Cir. 1993) (citing *Flood*, 407 U.S. at 283–84). The district

court failed to recognize this principle when it expanded the exemption to shield the behavior of a league that is not part of MLB or its Minor League affiliates. No other case has ever broadly interpreted the exemption to apply to entities not part of MLB.

Here, there was no dispute that Defendants are not part of MLB or its Minor League affiliates. Indeed, the Winter League Agreement with MLB expressly states that the League and its teams, like the other Caribbean leagues, are independent of, and not Minor League affiliates of, MLB. *See* JA150 ("[E]ach Winter League is not and shall be not considered to be a Minor League, and each Winter League Club is not and shall not be considered to be a Minor League Club.").

The district court wrongly believed that "[n]o federal courts have ever (before this case) expressly had to draw a distinction as to the applicability of [the exemption] to professional leagues that are non-MLB or Minor League affiliates." ADD14. To the contrary, the Supreme Court has repeatedly addressed this issue in refusing to extend the *Federal Baseball* exemption to any other sports business or league outside of MLB. *See Radovich*, 352 U.S. at 452 ("No other business claiming the

coverage of [*Federal Baseball*, *Flood*, and *Toolson*] has such an adjudication."); *Int'l Boxing*, 348 U.S. at 244–45; *Alston*, 141 S. Ct. at 2159. Those decisions should have led the district court to conclude that there is no basis for expanding the exemption beyond MLB.

As discussed above, the Supreme Court's justification for continuing to adhere to the *Federal Baseball* exemption in *Flood* was stare decisis—a rationale that only applies to MLB's reliance interest. *See Flood*, 407 U.S. at 283–84. By maintaining the exemption on stare decisis grounds, the Court essentially confined the exemption to its facts. *See Radovich*, 352 U.S. at 451; *cf. Piazza v. Major League Baseball*, 831 F. Supp. 420, 438, 440–41 (E.D. Pa. 1993) (even for MLB, the exemption should not extend beyond "matters of league structure [that are] unique to . . . baseball," such as the reserve clause at issue in *Toolson* and *Flood*). There is no basis for extending the exemption beyond MLB to the conduct of an independent baseball league in Puerto Rico.

The district court failed to consider the limited stare decisis rationale of *Flood* for continuing the exemption for MLB based on its reliance interest. Instead, it interpreted *Federal Baseball*'s outdated language as compelling it to apply the exemption broadly, to any baseball

business.  ADD14.  The court faulted Plaintiffs for "not advanc[ing] any cases to sustain their claim that the applicability of the clause only to MLB and its official minor leagues is 'established.'"  ADD13–14.  But it ignored the fact that every case cited by the district court or defendants applying the exemption only involved the conduct of MLB or its Minor Leagues.  *See, e.g.*, *Charles O. Finley & Co., Inc. v. Kuhn*, 569 F.2d 527, 541 (7th Cir. 1978); *Nostalgic Partners*, No. 21-10876, 2022 WL 14963876, at *1; *Wyckoff v. Off. of Comm'r of Baseball*, 211 F. Supp. 3d 615, 626 (S.D.N.Y. 2016); *Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 878 (N.D. Ill. 2015).  By contrast, in every case in which a sports business or league outside of MLB has sought to invoke the exemption, the Supreme Court has *refused* to do so.  *See supra* p. 27 (citing *Radovich*, *International Boxing*, and *Alston*).

Significantly, the district court identified no policy rationale that would justify expanding the *Federal Baseball* exemption to cover businesses that are not MLB affiliates.  Whereas MLB "develop[ed] on the understanding that it was not subject to existing antitrust legislation" (*Toolson*, 346 U.S. at 357), and "enormous capital had been invested in reliance on [the exemption's] permanence" (*Radovich*, 352 U.S. at 450),

34

the League and its franchises here have not even attempted to show that they ever relied on the exemption.  Nor could they.  In the face of *Radovich*, *International Boxing*, and *Flood*, it would have been clear to the League, when it re-formed (after disbanding for a year) in 2008,[8] that the *Federal Baseball* exemption had not been extended outside of MLB to apply to any other leagues or sports businesses.

Indeed, when the League filed its first motion to dismiss in this case, it did not even raise the exemption.  *See* ECF 28.  It was only the Franchise Defendants who belatedly asserted the exemption in the second motion to dismiss.  *See* ECF 43 at 3.  The district court should have found that this unprecedented attempt to expand the *Federal Baseball* exemption could not be justified under the case law.  This Court should now correct that error and prevent this "aberrational" exemption from expanding beyond MLB and undermining antitrust policy in other areas.

---

[8] *See Puerto Rican Winter League Honors Roberto Clemente with New Logo*, SportsLogos.net (Sept. 29, 2021), https://perma.cc/9DGV-HKFX.

**B.    If the *Federal Baseball* exemption covered a league other than MLB, it would not apply here, as Defendants' anticompetitive conduct falls outside the narrow "business of baseball."**

Even if the exemption covered the League, the district court's decision to apply it here would still have been error, as Defendants' conspiracy to restrain competition by seizing Plaintiffs' investor-operator interests does not fall within the narrow confines of the "business of baseball" that the exemption covers.  "The business of baseball"—a paraphrase of language used in *Federal Baseball* (*see Toolson*, 346 U.S. at 357)—is, as the DOJ has explained, limited to the central operations of an organized professional baseball league that are necessary for its existence, such as setting the rules of the games, the size of the fields, and the rules for hiring players.  DOJ Statement of Interest, *supra*, at 8–11.  It does not cover every type of anticompetitive conspiracy engaged in by a baseball league and its teams simply because the commerce restrained happens to be part of the baseball business.  *Id.*

1.    **The "business of baseball" only shields conduct "central" to organizing and operating a baseball league.**

The narrow exemption created by *Federal Baseball* is limited to "[t]he business" of "giving exhibitions of base ball." 259 U.S. at 208. *Toolson* further described this as "the business of providing public baseball games for profit between clubs of professional baseball players." 346 U.S. at 357. As the Supreme Court later stated in *Flood*, the "business of baseball" encompasses MLB's "unique characteristics and needs," such as the rules necessary to operate a league. 407 U.S. at 282.

Federal courts applying the exemption have recognized that, because the "business of baseball" is limited to these unique characteristics and needs, "conduct *not touching* on those characteristics or needs" falls outside the exemption. *Postema v. Nat'l League of Prof'l Baseball Clubs*, 799 F. Supp. 1475, 1489 (S.D.N.Y. 1992) (emphasis added), *rev'd on other grounds*, 998 F.2d 60 (2d Cir. 1993). Activities that restrain competition outside this narrow ambit are not covered by the exemption because they are "not central to the business of baseball." *Laumann v. NHL*, 56 F. Supp. 3d 280, 297 (S.D.N.Y. 2014).

For example, courts have held that the *Federal Baseball* exemption does not apply to restraints by MLB on competition for broadcasting rights or on competition in the labor market for umpires. *See id.* (MLB's contracts for broadcasting rights not protected by the exemption); *Postema*, 799 F. Supp. at 1489 (no "reason why the baseball exemption should apply to baseball's employment relations with its umpires"); *Henderson Broad. Corp. v. Hous. Sports Ass'n, Inc.*, 541 F. Supp. 263, 265 (S.D. Tex. 1982) ("[B]roadcasting is not central enough to baseball to be encompassed in the baseball exemption."). While these activities might restrain competition that relates to the baseball business, the exemption does not cover them because they are not central to the needs of operating a baseball league.

The DOJ's Antitrust Division has explained this critical limitation on the scope of the exemption. In the recent *Nostalgic Partners* case, the DOJ filed a Statement of Interest stating that the exemption for the "business of baseball" does not "cover *any* business that baseball organizations are involved in." DOJ Statement of Interest, *supra*, at 11 (emphasis added). Rather, the exemption applies only to "conduct closely

tied to the public exhibition of professional baseball games." *Id*. Expanding the "business of baseball" beyond this narrow scope would be "[in]consistent with the Supreme Court's guidance to 'strictly construe[]' exemptions from the antitrust laws." DOJ Amicus Brief, *supra*, at 7–8 (citations omitted).

> ### 2. The district court was wrong that Defendants' conspiracy to seize Plaintiffs' investor-operator interests satisfied the "business of baseball" requirement.

The conduct challenged here—Defendants' conspiracy to oust Plaintiffs from franchise ownership to eliminate their competition—does not fall within the "business of baseball" protected by the exemption because it was not part of the central operations of a baseball league. Indeed, the conspiracy had nothing to do with the necessary rules for operating a baseball league or its "unique characteristics." It was a concerted effort directed at driving out of business an investor-operator of a team who sought to engage in economic competition for the benefit of fans: the consumers of baseball games.

The district court erred because it wrongly believed that the Supreme Court decisions interpreting the *Federal Baseball* exemption required it to apply the exemption broadly, to any conduct that involved

39

the baseball business. ADD18. In reality, those Supreme Court decisions made clear that the exemption should be *narrowly* construed and applied. *See supra* p. 27 (citing *Radovich*, *International Boxing*, and *Alston*). For this reason, lower courts have repeatedly refused to expand the "business of baseball" to cover conduct that is not central to operating a league. *See, e.g.*, *Piazza*, 831 F. Supp. at 438, 440–41 (exemption does not apply to anticompetitive conduct by MLB to exclude a particular owner from purchasing an MLB franchise); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 512 F.2d 1264 (9th Cir. 1975) (exemption does not apply to anticompetitive conduct directed at MLB stadium concessionaires); *Laumann*, 56 F. Supp. 3d at 297; *Henderson*, 541 F. Supp. at 265; *Postema*, 799 F. Supp. at 1489. The district court did not discuss any of these decisions, which properly recognized that the "business of baseball" covered by the exemption should not be expanded to cover conduct that was not central to the operations of a league.

Instead, the district court relied on the only two district court decisions that incorrectly took a more expansive view of the exemption: *Right Field Rooftops, LLC v. Chicago Baseball Holdings* (N.D. Ill. 2015) and *Wyckoff v. Office of the Commissioner of Baseball* (S.D.N.Y. 2016).

ADD17–19. But even those decisions do not support applying the exemption to the conspiracy challenged here.

*Right Field Rooftops* was a challenge to the Chicago Cubs' plan to erect scoreboards that would obstruct the view of fans who had previously been able to watch games from neighboring buildings outside the stadium. *See* 87 F. Supp. 3d at 878. In determining that the exemption applied, the court found the scoreboard plan was within the "business of baseball" because it was part of the "business of manufacturing Cubs baseball and presenting that product to the public." *Id.* at 885. The scoreboard plan was thus found to be "central to the public display of baseball games." *Id.* (quotation omitted). That decision does not apply here, where the conspiracy to deprive Plaintiffs of their investor-operator interests in the Cangrejeros franchise had nothing to do with the League's "public display of baseball games." Moreover, the ultimate result in *Right Field Rooftops* has been criticized by the DOJ because, in its view, the scoreboard plan went "far beyond conduct central to offering public baseball games." DOJ Statement of Interest, *supra*, at 9 n.3.

Similarly, *Wyckoff* does not support applying the exemption to the conspiracy challenged here. In *Wyckoff*, the challenged conduct restrained competition in the "employment relationship between baseball scouts and Franchises." 211 F. Supp. 3d at 626. The court found that "[s]couts play a critical role in directing talent to the Franchises"—a role "so extraordinarily unique" to the game that it was "an integral part of" and "central to the 'business of baseball.'" *Id.* at 626–27 (citing *Right Field Rooftops*). By contrast, there is nothing "extraordinarily unique" to the game of baseball that would support a finding that a conspiracy to exclude Plaintiffs from operating the Cangrejeros franchise was an "integral part of" and "central to" the business of operating a baseball league.

To the contrary, the challenged conduct here is a conspiracy among the League, the Mayor of San Juan, and the Franchise Defendants to suppress competition by stripping Plaintiffs of their investor-operator interests in the Cangrejeros franchise. This conspiracy has nothing to do with the "unique characteristics" or needs of operating a baseball league. *Cf. Flood*, 407 U.S. at 282. Indeed, because it is unlawful conduct—even involving the Mayor of San Juan—which is clearly outside of the normal

42

bounds of league operations or rules, it can in no way be considered "central" to the business of baseball. *See, e.g.*, *Laumann*, 56 F. Supp. 3d at 297; *Henderson*, 541 F. Supp. at 265.

*   *   *

Alternatively, the discredited *Federal Baseball* exemption should be overruled as being inconsistent with modern antitrust and Commerce Clause authority. While this Court does not have the authority to do so, Plaintiffs hereby raise this alternative ground for appeal to preserve it for possible Supreme Court review.[9]

## II. Plaintiffs' antitrust claims under Puerto Rico law are not preempted by the Supremacy Clause (or the Commerce Clause).

After wrongly dismissing Plaintiffs' federal antitrust claims based on the *Federal Baseball* exemption, the district court "consequently dismissed" Plaintiffs' Puerto Rico antitrust and unfair competition claims in a single paragraph, citing the Supremacy Clause. ADD19. Because the

---

[9] A petition for certiorari pending before the Supreme Court in the case formerly called *Nostalgic Partners* asks the Court to overturn the *Federal Baseball* exemption. *See* Petition for Writ of Certiorari at i, *Tri-City Valley Cats, Inc. v. Off. of Comm'r*, No. 23-283 (U.S. Sept. 18, 2023).

court was wrong about the federal antitrust claims, its dismissal of the Puerto Rico law claims on that premise must also be reversed.

However, that was not the only legal error in the court's dismissal of the Puerto Rico antitrust claims. The district court stated that it dismissed the Puerto Rico law claims "based on the Supremacy Clause[,] as the Supreme Court held in *Flood* [that] 'state antitrust regulation would conflict with federal policy and . . . national uniformity (is required) in any regulation of baseball.'" *Id.* (ellipsis in original) (quoting 407 U.S. at 284). There are two fundamental errors in this conclusion.

*First*, in *Flood*, the state antitrust claims were dismissed under the Commerce Clause, not the Supremacy Clause (407 U.S. at 284–85), and the Commerce Clause does not preclude the application of Puerto Rico antitrust law in this case. The issue of Commerce Clause preemption arose in *Flood* because the reserve clause challenged there applied a set of labor-market rules to all players and MLB teams throughout the United States. *See Flood v. Kuhn*, 443 F.2d 264, 265 (2d Cir. 1971), *aff'd*, 407 U.S. 258. Under those circumstances, national uniformity was necessary to prevent the burdens to interstate commerce that would occur if

44

each state were to apply different antitrust rules to the reserve clause. *Flood*, 407 U.S. at 284–85.

Here, by contrast, there can be no such burdens on interstate commerce by applying Puerto Rico antitrust law to a conspiracy that was confined to Puerto Rico and engaged in by a league that only had teams in Puerto Rico. *See* JA36–39. In such a case, there is no risk of inconsistent antitrust laws being applied by multiple states, and there is no burden on interstate commerce by requiring the Defendants to comply with Puerto Rico antitrust law in operating a professional baseball league in Puerto Rico. *See, e.g.*, *Pharm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 85 (1st Cir. 2001) (no Commerce Clause problem where state law did not regulate "conduct occurring outside the state").[10]

*Second*, Plaintiffs' Puerto Rico law claims are not, as the district court wrongly held, preempted under the Supremacy Clause. To the contrary, the Supreme Court has held that federal antitrust laws do not preempt state antitrust laws, even when those state antitrust laws are more

---

[10] *See also* Amicus Curiae Brief of the State of Connecticut and Seventeen Other States in Support of Petitioners at 16, *Tri-City ValleyCats* (Oct. 23, 2023) ("State Amicus Br.") ("[T]here is no reason to think that an even-handed state antitrust enforcement action against the business of baseball would necessarily violate the dormant Commerce Clause.").

stringent and would thus proscribe conduct that would not be a federal antitrust violation. *See, e.g.*, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 993 (9th Cir. 2000) ("the Supreme Court has made clear that neither the Sherman Act nor the Commerce Clause preempts state antitrust laws" (citing *ARC America*, 490 U.S. at 104)). "[F]ederal antitrust law has never been held to completely preempt state antitrust law." *Patriot Cinemas, Inc. v. Gen. Cinema Corp.*, 834 F.2d 208, 216 n.4 (1st Cir. 1987). The Supremacy Clause permits states to have their own antitrust laws—even if they "impose liability over and above that authorized by federal law"—unless a "clear purpose of Congress" indicates otherwise. *See ARC America*, 490 U.S. at 105; *accord Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 82 (1st Cir. 1997) (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 89 (1990)).

There was no such purpose here. "Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies." *ARC America*, 490 U.S. at 102. The Sherman Act was therefore "not intended to . . . foreclose otherwise valid state regulation." *Mass. Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n*, 197 F.3d 560, 563

(1st Cir. 1999). As a coalition of 18 state attorneys general recently explained, "Congress [has] never spoke[n] at all—much less clearly and unmistakably—to federal preemption of state antitrust enforcement against the business of baseball." State Amicus Br. 4. To the extent "Congress wants nationwide uniformity on the business of baseball, the federalism canon tells it how to get that: by clearly articulating an intent to displace state antitrust laws." *Id.* at 16. But "[a]bsent that clear statement, states must be able to exercise their police powers to promote competition and protect consumers." *Id.* This is especially true here, where the conduct at issue only took place in Puerto Rico, providing that jurisdiction with a compelling interest to apply its own antitrust law.

## III. The district court erred in dismissing Plaintiffs' § 1983 claim on res judicata grounds.

The district court also erred in dismissing Plaintiffs' § 1983 claim under principles of res judicata. ADD29. Controlling Puerto Rico law places on Defendants, "[a]s the party asserting the res judicata defense, . . . the burden of demonstrating that [Plaintiffs'] claims were raised or could have been raised in the state proceedings." *Puerto Ricans for P.R. Party v. Dalmau*, 544 F.3d 58, 70 (1st Cir. 2008); *see also Cruz v. Melecio*, 204 F.3d 14, 18–19 (1st Cir. 2000) (Puerto Rico res judicata law

applies).  But in a clear legal error, the district court flipped the burden on its head, concluding that "*Plaintiffs* fail[ed] to demonstrate that res judicata *cannot* apply."  ADD27 (emphases added).  Further, no matter who has the burden on this issue, the requirements for applying res judicata do not bar the federal civil rights claim asserted in this action.

For res judicata to bar the civil rights claim asserted in the second suit, Defendants had to establish (in addition to a final judgment on the merits in the earlier suit) an identity between the causes of action and the parties to the two suits.  *See Monagas v. de Arellano*, 674 F.3d 45, 51 (1st Cir. 2012).  According to the district court, (1) Plaintiffs were "attempt[ing] to bring the same claim" in their earlier Superior Court action "under a different theory," and (2) "the real parties of interest" in the § 1983 claim "are . . . [the League] and Flores," not the Franchise Defendants sued for the first time in the federal case.  ADD25–27.  But neither the required identity of claims nor identity of parties exists to apply res judicata against Plaintiffs' federal civil rights claims.

Plaintiffs' federal civil rights complaint did not seek to relitigate the Superior Court's finding that, as a matter of contract law, the League Constitution permitted the League and its president to suspend and fine

Axon. Rather, the federal case alleged an illegal conspiracy, with the participation of the Mayor of San Juan, to violate Axon's civil rights by expelling him entirely and taking the Cangrejeros franchise from him without due process. These conspiratorial acts did not take place until after the Superior Court suit ended—in fact, the League president claims the decision to take away Axon's franchise was undertaken *in response to* the Superior Court suit. JA32. Moreover, the civil rights conspiracy involves new conspirators who were not (and could not have been) involved in the Superior Court action, such as the Mayor of San Juan, and Impulse Sports, which was not even formally incorporated until 15 days after the Superior Court ruled. JA34. In short, the federal civil rights claim asserted in this action involves very different allegations against different parties than the narrow breach of contract claim resolved in the Superior Court action. There is no identity of either claims or parties, as res judicata requires. The district court erred in holding otherwise.

**A.    There can be no perfect identity of claims, as the § 1983 claim arises from conduct that occurred *after* the Superior Court action and is based on a different and broader set of conspiratorial acts.**

The district court was demonstrably wrong in determining that the Superior Court action seeking a preliminary injunction to block Axon's

suspension was "the same claim" as the § 1983 claim for purposes of res judicata.  ADD26.  Indeed, this was a factual and legal impossibility.  Because the § 1983 claim arose from conduct that did not occur until after the Superior Court action—the seizure of Plaintiffs' investor-operator interest in the Cangrejeros franchise without due process—it could not have been the "same claim" as the prior suspension challenged in the Superior Court action.

For an earlier claim to preclude a later claim, they must "share a perfect identity of both 'thing' and 'cause.'"  *Monagas*, 674 F.3d at 51 (quotation omitted).  Perfect identity of "thing" occurs when the claims "involve the same object or matter."  *Id.* (quotation omitted).  They "share a perfect identity of 'cause'" when they "derive from a common nucleus of operative facts."  *Id.* (quotation omitted).

Conversely, a res judicata defense will be defeated if there are "genuine differences" between the two actions.  *Gener-Villar v. Adcom Grp., Inc.*, 417 F.3d 201, 206 (1st Cir. 2005).  Genuine differences exist when the later claim involves "conduct [that is] broader and more far-reaching than the conduct which led to the original complaint."  *Walsh v. Int'l Longshoremen's Ass'n*, 630 F.2d 864, 873 (1st Cir. 1980); *accord Alston v.*

50

*Town of Brookline*, 997 F.3d 23, 39 (1st Cir. 2021) ("Where . . . subsequent conduct is materially more extensive than the conduct underlying an earlier suit, claim preclusion will not lie.").

The timeline here is critical. If material operative facts relating to the broader conduct challenged "occur[] after the [earlier] decision," they can become "the basis of a second action" that is not precluded—even if they relate to the same subject matter or must be "taken in conjunction with the antecedent facts." *Whole Women's Health v. Hellerstedt*, 579 U.S. 582, 599 (2016) (quoting Restatement (Second) of Judgments § 24, cmt. f (1980)). "[R]es judicata operates to preclude only claims that were or could have been raised in a previous suit." *Boateng v. Interamerican Univ. Inc.*, 210 F.3d 56, 62 (1st Cir. 2000). It "will not attach if the claim asserted in the second suit could not have been asserted in the first." *Mass. Sch. of Law v. Am. Bar*, 142 F.3d 26, 38 (1st Cir. 1998).

Applying these controlling principles, res judicata cannot bar the later § 1983 claim, which challenges a seizure of property (supported by the Mayor of San Juan under color of state law) that did not occur until after the earlier Superior Court action was resolved. There was thus neither an identity of "thing" nor "cause" to support res judicata.

Further, the Superior Court action was limited to a claim that the
League and Flores could not fine and suspend Axon without violating the
League Constitution.  JA100–01.  The instant case does not seek to relit-
igate those issues.  Rather, this case challenges the unlawful conspiracy
resulting in the permanent seizure of Plaintiffs' property.  Indeed, Plain-
tiffs' § 1983 claim in this case did not challenge the fine and suspension
at all.  It asserted a civil rights claim based on the subsequent conspira-
torial acts, among all the Defendants and the Mayor of San Juan, to de-
prive Plaintiffs of their investor-operator interest in the Cangrejeros
franchise on a permanent basis without due process of law.  JA31–32.  In
fact, according to Flores, Defendants took action to seize Plaintiffs' inves-
tor-operator interests on May 5, 2022 *in response to* Axon initiating and
losing the Superior Court action.  *See* JA32.  The timeline here differs
materially from the cases the district court relied on, where litigants at-
tempted to relitigate issues that other tribunals had already resolved.[11]

---

[11] *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75 (1984)
(petitioner did not litigate her § 1983 claim in state court, but could have
done so); *Baez-Cruz v. Municipality of Comerio*, 140 F.3d 24, 31 (1st Cir.
1998) ("judicially reviewed administrative fact-finding may later estop a
federal claim, even though the state administrative body itself was una-
ble to consider the federal claim"); *Arecibo Radio Corp. v. Puerto Rico*,
825 F.2d 589, 592 (1st Cir. 1987) (plaintiffs faced "not only . . . one state

The district court also erred, as a matter of law, in finding that the two actions shared a "common nucleus of operative facts." ADD25–26. The subsequent seizure of Plaintiffs' investor-operator interests was distinct from, and much broader than, the suspension challenged in the Superior Court action, and it could not have been adjudicated in that earlier case, as it did not take place until after the Superior Action was concluded. Res judicata thus cannot bar the § 1983 claim. *See Cruz*, 204 F.3d at 19 ("[F]or res judicata to operate, the precluded party must have had a full and fair opportunity to litigate her case in the earlier proceeding.").

**B. There can be no perfect identity of parties given the six new defendants to this action, one of which did not exist when the Superior Court ruled.**

The district court erred in dismissing the § 1983 claim on res judicata grounds for the additional reason that the parties to the Superior Court action and this case were not, in fact, either identical or in privity. ADD26–27. Res judicata requires a "perfect identity of parties" between the earlier and later cases—that is, either "(i) the parties in the current

---

court judgment rejecting the[ir] challenges," but "*a second state court judgment holding that the first is res judicata*").

action were also parties in the prior action; or (ii) the parties in the current action are in 'privity' with the parties in the prior action." *Monagas*, 674 F.3d at 51.  Here, neither is true.

The parties to this action are not the same as the Superior Court action, in which Axon and Cangrejeros LLC only sued the League and Flores, and no other parties, because the League and Flores were the parties imposing the challenged suspension in violation of the League's Constitution.  JA81.  Preliminarily, the Superior Court concluded that Axon was not the proper party to challenge the League's conduct, as he was not a party to the contract at issue.  JA110.  Here, Axon and Cangrejeros LLC—joined by co-plaintiff Santurce Merchandising—have brought an entirely different and much broader conspiracy claim that is directed not just at the Leagues and Flores, but also at the six separately owned and operated Franchise Defendants, including one defendant, Impulse Sports, that did not exist until May 20, 2022, after the Superior Court action was completed.  JA18–20, JA34.

None of the Franchise Defendants could have been parties to the Superior Court action challenging Axon's suspension, as they were not

the persons authorized by the League Constitution to impose the challenged suspension. JA81. They thus were also not in privity with the League and Flores with respect to a breach of contract claim challenging a course of conduct for which they were not responsible. *See* JA31–34. And Impulse Sports could not possibly be in privity with the defendants in the Superior Court action when it did not even exist at that time. JA34.

There can be no perfect identity of parties where, as here, the new defendants could not have exercised any control over the prior litigation, in which their conduct was not at issue. *See, e.g.*, *Perez-Guzman v. Gracia*, 346 F.3d 229, 234 (1st Cir. 2003) (no preclusion where plaintiff disclaimed any exercise of control over prior action and defendants "show[ed] only that [plaintiffs'] attorney also represented" the plaintiff in the prior action), *abrogated on other grounds by Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005); *Coors Brewing Co. v. Mendez-Torres*, 562 F.3d 3, 21 (1st Cir. 2009) (absent evidence that party to later action "controlled the [earlier] action," the "similarity of interests" between parties to earlier and later actions was "inadequate to establish the representation . . . required to find sufficient identity of parties under Puerto

Rico law"), *abrogated on other grounds by Levin v. Com. Energy, Inc.*, 560 U.S. 413 (2010).

Under Puerto Rico law, "privity" is established when "one party acts for or stands in the place of another in relation to a particular subject matter." *Berrios v. Gonzalez-Rosario*, 630 F.3d 7, 14 (1st Cir. 2010) (quotation omitted). Here, because the Franchise Defendants' conduct was not at issue in the Superior Court action, there can be no finding that they were in privity with the League and Flores in that action.

The district court's sweeping conception of what constitutes identity of claims and parties cannot be squared with the accepted rule that res judicata is to be narrowly applied—especially when it risks depriving plaintiffs of fundamental rights. *See, e.g.*, *Richards v. Jefferson Cnty.*, 517 U.S. 793, 797 (1996) ("extreme applications of the doctrine of res judicata may be inconsistent with a federal right that is fundamental in character" (quotation omitted)). Plaintiffs' § 1983 claim—which involved different conduct and parties, and was completely distinct from the breach of contract claim asserted in the Superior Court action—should not have been dismissed on this basis.

\*    \*    \*

Because the district court erred in dismissing Plaintiffs' federal antitrust and civil rights claims, its dismissal of the remaining Puerto Rico claims for lack of supplemental jurisdiction was also in error and should be reversed. *See Belini v. Wash. Mut. Bank, FA*, 412 F.3d 17, 28–29 (1st Cir. 2005) ("now that we have held that there is a viable federal claim for damages, the district court should exercise supplemental jurisdiction over the [state law] claim").

## CONCLUSION

For all of these reasons, this Court should reverse the judgment of the district court and remand for further proceedings.

Respectfully submitted,

Lauren Gailey
WINSTON & STRAWN LLP
1901 L Street, NW
Washington, DC 20036
(202) 282-5823

Carlos A. Rodriguez-Vidal
GOLDMAN ANTONETTI &
  CORDOVA, LLC
P.O. Box 70364
San Juan, PR 00936
(787) 759-4117

*/s/ Jeffrey L. Kessler*
Jeffrey L. Kessler
Jeffrey J. Amato
Lauren E. Duxstad
Robert S. Pannullo
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-4698
JKessler@winston.com

*Counsel for Appellants Cangrejeros de Santurce Baseball Club, LLC, Santurce Merchandising LLC, and Thomas J. Axon*

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,552 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface, 14-point Century Schoolbook, using Microsoft Word for Microsoft 365 MSO.

Dated:      November 7, 2023

*/s/ Jeffrey L. Kessler*
Jeffrey L. Kessler

## CERTIFICATE OF SERVICE

I certify that on November 7, 2023, I caused this brief to be filed through the ECF system, which sent a Notice of Electronic Filing to counsel of record.

*/s/ Jeffrey L. Kessler*
Jeffrey L. Kessler

ADDENDUM

# TABLE OF CONTENTS

## Addendum

| ECF | Date | Document | Page(s) |
|---|---|---|---|
| 80 | 06/27/2023 | Memorandum and order | ADD1–29 |

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

```
_____
                                )
CANGREJEROS DE SANTURCE BASEBALL )
CLUB, LLC, SANTURCE MERCHANDISING )
LLC, and THOMAS J. AXON,         )
                                )
                                )
                                )
               Plaintiffs,      )
                                )          CIVIL ACTION
           v.                   )          NO. 3:22-01341-WGY
                                )
LIGA DE BÉISBOL PROFESIONAL DE   )
PUERTO RICO, INC., CRIOLLOS      )
MANAGEMENT, INC., RA12, INC.,    )
INDIOS DE MAYAGÜEZ BASEBALL CLUB )
INC., GIGANTES DE CAROLINA       )
BASEBALL CLUB INC., LEONES DE    )
PONCE CF INC., IMPULSE SPORTS    )
ENTERTAINMENT CORPORATION, JUAN A. )
FLORES GALARZA, IN HIS CAPACITY  )
AS PRESIDENT OF THE LIGA DE      )
BÉISBOL PROFESIONAL DE PUERTO RICO,)
INC., IN HIS PERSONAL            )
CAPACITY, AND AS A MEMBER OF THE )
CONJUGAL PARTNERSHIP             )
CONSTITUTED BETWEEN HIM AND HIS  )
SPOUSE, AND THE CONJUGAL         )
PARTNERSHIP SO CONSTITUTED,      )
                                )
               Defendants.      )
_____)
```

YOUNG, D.J.[1]                                  June 27, 2023

**MEMORANDUM & ORDER**

---

[1] Of the District of Massachusetts, sitting by designation.

[1]

ADD1

## I.   INTRODUCTION

The Court here boldly goes where no lower court has gone

before.   Why?   The Supreme Court has said so.[2]   This Court

applies the Supreme Court's much criticized[3] judicial exemption

_____

[2] In <u>Agostini</u> v. <u>Felton</u>, the Supreme Court held the trial court "acted within its discretion in entertaining the motion with supporting allegations, but it was also correct to recognize that the motion had to be denied unless and until this Court reinterpreted the binding precedent." <u>Agostini</u> v. <u>Felton</u>, 521 U.S. 203, 237–38, 117 S. Ct. 1997, 2017, 138 L. Ed. 2d 391 (1997). The <u>Agostini</u> Court also reaffirmed "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." <u>Id.</u> (citing <u>Rodriguez de Quijas</u> v. <u>Shearson/Am. Express, Inc.</u>, 490 U.S. 477, 484 (1989) (Kennedy J.)).

[3] The baseball exemption is heavily criticized by courts, legal scholars, and commentators. <u>See</u> Nathaniel Grow, <u>Defining the "Business of Baseball": A Proposed Framework for Determining the Scope of Professional Baseball's Antitrust Exemption</u>, 44 U.C. Davis L. Rev. 557 (2010) ("This lack of consensus regarding the scope of the exemption is particularly problematic because MLB regularly finds itself embroiled in antitrust disputes. For example, in August 2009, trading card manufacturer Upper Deck threatened to file an antitrust suit against MLB following MLB's decision to grant rival card manufacturer Topps an exclusive trademark license . . . in 2007, Pennsylvania Senator Arlen Specter alleged that a proposed deal between MLB and DirecTV, under which the satellite television company would have received the exclusive rights to air MLB's "Extra Innings" broadcasting package, violated antitrust law. Meanwhile, MLB's restrictive territory allocation policies--a regular source of antitrust complaints against the league--were again at issue in December 2009 when the city attorney for San Francisco threatened to sue MLB after the league considered permitting the Oakland Athletics franchise to relocate to San Jose, territory assigned to the San Francisco Giants organization. Had any of these disputes resulted in litigation, the applicability of the baseball antitrust exemption would have been unclear under both the existing

to the Nation's antitrust laws to a Puerto Rican professional
baseball venture NOT associated with Major League Baseball
("MLB").

The Plaintiffs, Cangrejeros de Santurce Baseball Club, LLC
("Cangrejeros LLC"), Santurce Merchandising LLC ("Santurce
Merchandising"), and Thomas J. Axon ("Axon"), collectively "The
Plaintiffs," bring a seven count complaint against the
Defendants, Liga de Béisbol Profesional de Puerto Rico, Inc.
(the "League"), Criollos Management, Inc. (the "Criollos"),
RA12, Inc. ("RA12"), Indios de Mayagüez Baseball Club Inc. (the
"Indios"), Gigantes de Carolina Baseball Club Inc. (the
"Gigantes"), Leones de Ponce CF Inc. (the "Leones"), Impulse
Sports Entertainment Corporation ("Impulse Sports"), Juan A.
Flores Galarza, in his capacity as president of the Liga de

---

judicial precedent and scholarly analysis."); Nostalgic
Partners, LLC v. Off. of Comm'r of Baseball, No. 21-CV-10876
(ALC), 2022 WL 14963876, at *1 (S.D.N.Y. Oct. 26, 2022)
("Plaintiffs believe that the Supreme Court is poised to knock
out the exemption, like a boxer waiting to launch a left hook
after her opponent tosses out a torpid jab. It's possible. But
until the Supreme Court or Congress takes action, the exemption
survives; it shields MLB from Plaintiffs' lawsuit."); J. Gordon
Hylton, Why Baseball's Antitrust Exemption Still Survives, 9
MARQ. SPORTS L.J. 391 (1999) ("Neither Congressional inertia nor
the power of Organized Baseball can explain the persistence of
this exemption."). The list goes on.

ADD3

Béisbol Profesional de Puerto Rico, Inc., in his personal capacity ("Flores"), and as a member of the conjugal partnership constituted between him and his spouse, and the conjugal partnership so constituted ("Flores Conjugal Partnership") and collectively, "The Defendants."  All counts are listed and described below:

**(1) Count One** alleges Violations of Section 1 of the Sherman Act: Agreement Among the Defendants in Unreasonable Restraint of Competition;

**(2) Count Two** alleges Violations of Section 2 of the Sherman Act: Conspiracy or Combination to Monopolize, Monopolization, and Attempted Monopolization;

**(3) Count Three** alleges Violations of the Antitrust Law of Puerto Rico (P.R. Laws Ann. tit. 10, § 258): Agreement Among the Defendants in Unreasonable Restraint of Competition;

**(4) Count Four** alleges Violations of the Antitrust Law of Puerto Rico (P.R. Laws Ann. tit. 10, § 260): Conspiracy or Combination to Monopolize, Monopolization, and Attempted Monopolization;

**(5) Count Five** alleges Violations of Fair Competition, P.R. Laws Ann. tit. 10, § 259, and Article 1536 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 10801 and 10803;

**(6) Count Six** alleges Contracts in Prejudice of a Third Person;

**(7) Count Seven** alleges Violations of Civil Rights Act of 1871, 42 U.S.C. § 1983.

[4]

ADD4

The Defendants first moved to dismiss the complaint for failure to state a claim, arguing that (1) the Plaintiffs are contractually bound to litigate their claims in the local courts of Puerto Rico, Def.'s Mot. Dismiss FSC ("Def's. Mot. FSC"), ECF No. 28 at 5, and (2) the Plaintiffs' action is barred by res judicata after the Plaintiffs lost their prior case filed in the local court of Puerto Rico.  Id. at 10.

The Defendants then moved to dismiss the complaint for lack of subject matter jurisdiction on the basis that the Plaintiffs' antitrust claims must be dismissed because the "business of baseball" is exempt from antitrust regulation, which would make the federal antitrust claims fail, thus giving this Court no subject matter jurisdiction to hear the case.  Def.'s Mot. Dismiss SMJ ("Def's. Mot. SMJ"), ECF No. 43 at 6-13.

Following the direction of the Supreme Court's baseball exemption, this Court allows the Defendants' motions to dismiss.

**A.   Procedural History**

The Plaintiffs, Axon and Cangrejeros LLC, previously filed a suit against the League and its President, Mr. Juan A. Flores Galarza, seeking a preliminary and permanent injunction, and seeking declaratory relief in Puerto Rico with regards to his dismissal.  Axon v. Liga De Beisbol Professional de Puerto Rico, Inc., No. SJ-2022-CV-02802 (Super. Ct. P.R. May 5, 2022).  The

[5]

ADD5

court dismissed the complaint, reasoning that "[we] must conclude that the process followed by the President of the League complied with the contractual due process of law established by the parties in the Constitution of the [LBPPR]." Id. at 12.

The Plaintiffs filed a complaint on July 18, 2022, Pl.'s Compl. & Demand Jury Trial ("Compl.") ECF No. 1 and bring the seven counts listed in the introduction.

The Defendants moved to dismiss this complaint for failure to state a claim on September 12, 2022, Def's. Mot. FSC, and then again on October 27, 2022 for lack of subject matter jurisdiction. Def's. Mot. SMJ.

Def's. Mot. FSC was met with an opposition by the Plaintiffs filed on October 12, 2022, Pls.' Opp'n FSC, ECF No. 40. Def's. Mot. SMJ was met with an opposition by the Plaintiffs filed on November 10, 2022, Pls.' Opp'n SMJ, ECF No. 49. The Defendants filed a reply on December 2, 2022, Def.'s Reply SMJ, ECF No. 53. On March 29, 2023, the Court heard argument on the motion to dismiss and took the matter under advisement. See Electronic Clerk's Notes, ECF No. 79

**B. Factual Background**

    **1. Facts Alleged Relating to the Antirust Claims**

[6]

ADD6

The Defendant, League, is "the only top-tier professional baseball league in Puerto Rico, currently consisting of six different franchise teams operated by separately owned investors who do not share profits and losses with each other." Compl. ¶ 1.  As well as competing on the field, the teams compete "for fans, in-person attendance, player talent, sponsorships, merchandise sales, radio, and streaming broadcast rights agreements." Id.

The Complaint challenges, under both federal and Puerto Rico antitrust laws, "concerted behavior in unreasonable restraint of trade through which the Defendants entered into an unlawful conspiracy to boycott and exclude the Plaintiffs from competing as participants in the relevant markets for investing in and operating top-tier professional baseball teams in Puerto Rico."  Id. ¶ 2

The prologue to this alleged behavior is the purchase of operating control of Cangrejeros de Santurce professional baseball team (the "Cangrejeros Franchise") by Axon in October 2019.  Axon became the sole owner and member on February 4, 2022.  Id. ¶ 3.  Axon went on to improve the "competitive success of the Cangrejeros Franchise through increased levels of investment and dynamic new ways to operate and promote the team in economic competition."  Id.  Axon's "procompetitive efforts to improve the quality of the Cangrejeros Franchise were met

[7]

ADD7

with stiff resistance by the other teams in the League, who did not want to have to face such enhanced economic competition." Id. ¶ 5.  This resistance was allegedly characterized by a "group boycott" and the "unlawful seizure of [the] Plaintiffs' investor-operator interest in the Cangrejeros Franchise, which was then resold to a different investor-operator, [the] Defendant Impulse Sports Entertainment Corporation ('Impulse Sports')." Id.

This alleged collective boycott took the form of "unlawful contracts, combinations, and/or conspiracies" that had the effect of "unreasonably restraining competition and creating and maintaining a monopoly for [the] Defendants in the relevant markets for investing in and operating top-tier professional baseball teams in Puerto Rico." Id. ¶ 6.  This conduct led to "significant antitrust injuries to [the] Plaintiffs in their business and property." Id.  These injuries are represented by "the loss of [the] Plaintiffs' ability to derive competitive value from the ticket sales, sponsorship, concessions, merchandise, and radio and streaming broadcast rights of the Cangrejeros Franchise, and the loss of the ability to compete in the relevant markets through the operation of a professional baseball team in Puerto Rico." Id. ¶ 94.

### 2.  Facts Relating to Alleged Violations of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

[8]

The Plaintiffs allege the Defendants "conspired with one another and co-conspirator Romero Lugo, [the Mayor of San Juan] acting on behalf of the municipality of San Juan, to deprive Plaintiffs, without due process of law, of their property interests and rights, privileges, and immunities secured by the United States Constitution and laws of the United States under the color of government action by a municipality of Puerto Rico." Compl. ¶ 159.  Essentially, the conspiracy allegedly "deprived Axon and Cangrejeros LLC, without any due process or compensation, of their established property interest in being the investor-operator of the Cangrejeros Franchise and having control over the commercial exploitation of the team's various rights without affording them compensation or due process of law." Id.  They did so to "accomplish the objective of San Juan to suppress requests by the Franchise for various improvements in its stadium, to suppress the proposal for a private investment in the stadium, and to eliminate the possibility that the team would move to another municipality in Puerto Rico." Id. ¶ 160.

## II.  ANALYSIS

The Defendants move to dismiss the complaint for lack of subject matter jurisdiction on three grounds.  First, the Plaintiffs' antitrust claims must be dismissed because the

"business of baseball" is exempt from antitrust regulation and the Puerto Rico Professional Baseball League falls squarely within the core of baseball's antitrust exemption.  Def's. Mot. SMJ 6-10.  Second, the Defendants argue the Plaintiffs' state claims are barred by the Supremacy Clause and the Commerce Clause.  Id. at 13.  Finally, the Defendants argue that the Plaintiffs' unfair competition law and tort claims fail as matter of law.  Id. at 15-17.

### A.   Standard of Review

As courts of limited jurisdiction, federal courts must resolve questions related to their subject-matter jurisdiction before addressing the merits of a case.  Destek Grp. v. State of N.H. Pub. Utils. Comm'n, 318 F.3d 32, 38 (1st Cir. 2003).  The party asserting jurisdiction has "the burden of demonstrating the existence of federal jurisdiction."  Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998).  If it appears to the Court at any time that it lacks the statutory or constitutional power to adjudicate the case, it must dismiss the action, even in the absence of a challenge from any party.  Arbaugh v. Y&H Corp., 546 U.S. 500, 514, (2006); Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1187 (2d Cir. 1996).

Federal Rule of Civil Procedure 12(b)(1) limns the appropriate mechanism for challenging a court's subject-matter

jurisdiction. <u>Valentín</u> v. <u>Hosp. Bella Vista</u>, 254 F.3d 358, 362
(1st Cir. 2001). The rule serves as a "large umbrella,
overspreading a variety of different types of challenges to
subject-matter jurisdiction." <u>Id.</u> at 362–63. A motion to
dismiss brought under Rule 12(b)(1) is subject to a similar
standard of review as a motion brought pursuant to Rule
12(b)(6). <u>Boada</u> v. <u>Autoridad de Carreteras y Transportación</u>,
680 F. Supp. 2d 382, 384 (D.P.R. 2010) (citing <u>Negrón–Gaztambide</u>
v. <u>Hernández–Torres</u>, 35 F.3d 25, 27 (1st Cir. 1994)). The
district court "must credit the plaintiff's well-pled factual
allegations and draw all reasonable inferences in the
plaintiff's favor." <u>Merlonghi</u> v. <u>United States</u>, 620 F.3d 50, 54
(1st Cir. 2010) (citing <u>Hosp. Bella Vista</u>, 254 F.3d at 363).
"[T]he Court's inquiry, however, is not necessarily limited to
the parties' pleadings, and may include whatever evidence has
been presented in the case." <u>Fed. Deposit Ins. Corp.</u> v. <u>Caban-
Muñiz</u>, 216 F. Supp. 3d 255, 257 (D.P.R. 2016) (citing <u>Aversa</u> v.
<u>United States</u>, 99 F.3d 1200, 1210 (1st Cir. 1996)).

### B. The Plaintiffs' Antitrust Claims Must Be Dismissed Because the "Business of Baseball" is Exempt From Antitrust Regulation.

The Defendants argue the Plaintiffs' antitrust claims must
be dismissed because the "business of baseball" is exempt from
antitrust regulation. Def's. Mot. SMJ at 6-10.

The Plaintiffs oppose this motion on the basis that what they call "the MLB exemption" does not apply to this case. They argue first that the anomalous MLB exemption must be narrowly construed and can only be applied to MLB and its affiliated minor leagues. Pls.' Opp'n SMJ at 5-6. Second, that the Defendants cannot invoke the MLB exemption as the league operates as an independent baseball league that is not a minor league affiliate of MLB. Id. at 8-10. Third, that the conduct alleged does not fall within the narrow confines of the "business of baseball," and finally, that the Defendants also cannot qualify for the MLB exemption because there is no showing that they have relied on the existence of the exemption. Id. at 10-13.

### 1. The Puerto Rico Professional Baseball League Falls Squarely Within the Core of Baseball's Antitrust Exemption.

The Defendants start their argument by setting forth the 1922 Supreme Court decision that held that "the Clayton and Sherman Acts do not govern the business of baseball. Fed. Baseball Club, Inc. v. Nat'l League of Prof'l Baseball Clubs, 259 U.S. 200 (1922)." Def.'s Mot. SMJ at 7. The Defendants emphasize that the plaintiff in that case was "Federal Baseball, the last remaining club in the Federal League (and not Major League Baseball)." Id. They further continue to list the sustained holding in Supreme Court decisions, emphasizing "the

U.S. Supreme Court has repeatedly held that the antitrust exemption applies to the 'business of baseball.'"  Id. at 10.

The Plaintiffs disagree on this crucial aspect and instead consider that "the exemption covers only MLB and its minor league affiliates and thus does not extend to the League or the Franchise Defendants."  Pls.' Opp'n SMJ 5.

The Plaintiffs' and the Defendants' acknowledgement of the exemption differs first in their appellation of it.  The Defendants name it throughout their motion and opposition as the "baseball antitrust exemption" while the Plaintiffs call it the "MLB exemption". Def's. Mot. FSC; Def.'s Mot. SMJ; Pls.' Opp'n FSC; Pls.' Opp'n SMJ.  Words matter.  As Holmes said, "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Towne v. Eisner, 245 U.S. 418, 425(1918).  The Plaintiffs' naming is telling: their main argument is that the exemption applies to MLB and its minor leagues only, and "[b]ecause it is established that the MLB exemption can only be applied to MLB and its official minor league affiliates—and no other sports business—Defendants may not invoke it to protect their anticompetitive conduct here."  Pls.' Opp'n SMJ 8.  The Plaintiffs do not advance any cases to sustain their claim that the applicability of the clause only to MLB and its official

[13]

minor leagues is "established."  In fact, an exhaustive search throughout all federal courts in this country does not provide for a single case using the denomination "MLB exemption".

No federal courts have ever (before this case) expressly had to draw a distinction as to the applicability of this clause to professional leagues that are non-MLB or Minor League affiliates.  Thus, this analysis focuses on interpreting the language and semantics of the major Supreme Court cases that define this exemption.

In the famous 1972 case brought by baseball player Curt Flood, the Supreme Court named the exemption as follows: "The longstanding exemption of **professional baseball** from the antitrust laws, Federal Baseball Club v. National League, 259 U.S. 200 (1922); Toolson v. New York Yankees, Inc., 346 U.S. 356 (1953) . . . ."  Flood v. Kuhn, 407 U.S. 258 (1972) (emphasis added).

Its predecessor, the 1953 Toolson case heard by the same Court, affirmed its earlier ruling in Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs, 259 U.S. 200, holding: "[T]his Court held that the business of providing public baseball games for profit between **clubs of professional baseball players** was not within the scope of the federal antitrust laws."  346 U.S. 356, at 357 (emphasis added).

[14]

ADD14

The wording is clear: the antitrust exemption applies to professional baseball. Had the Cangrejeros team, a professional baseball team, and the Winter League been an amateur team, the non-applicability of the exemption could have been better supported. Even with amateur baseball, however, the District Court of Puerto Rico has been hesitant on the non-applicability of the clause when amateur players were paid a salary:

> The only hesitation this Court has in a blanket application of the exemption is that the Supreme Court has expressly limited it to professional baseball, holding "we now specifically limit the rule there established [in Federal Baseball] to the facts there involved, i.e. the business of organized professional baseball." Radovich v. National Football League, 352 U.S. 445, 451-452 (1957). In addition, the First Circuit has construed Flood, the Supreme Court's most recent pronouncement on the exemption, as "holding that the longstanding judicially created exemption of professional baseball from the Sherman Act is an established 'aberration' in which Congress has acquiesced." Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147, 1185 n.4 (1st Cir. 1994) (emphasis added).

> Although the Federation is allegedly an amateur organization, because its players are paid a salary as per the complaint, and because it is not clear that AA baseball is purely an amateur gig, the exemption for pro-ball may well be applicable. Having already determined that there is no subject matter jurisdiction under the Sherman Act, however, the Court declines to decide whether the exemption applies.

Melendez v. Federacion de Beisbol Aficionado de Puerto Rico, Civil No. 05-1040 (PG), 2005 WL 8213102, at *3 (D. P.R. Feb. 11, 2005) (Pèrez-Gimènez, J.).

[15]

In their complaint, the Plaintiffs leave no doubt as to the professional nature of the Cangrejeros team: "Defendant Liga de Béisbol Profesional de Puerto Rico, Inc., (the "League") is the only top-tier professional baseball league in Puerto Rico, currently consisting of six different franchise teams operated by separately owned investors who do not share profits and losses with each other."  Compl. ¶ 1.  "In October 2019, Axon, through Cangrejeros LLC, purchased operating control of the Cangrejeros de Santurce professional baseball team (the "Cangrejeros Franchise")."  Id. ¶ 3.  Thus, the baseball exemption is applicable to Cangrejeros de Santurce, a professional baseball team.

The Plaintiffs further argue that "[e]ven if the Court finds that the MLB exemption can be extended to the League and its members . . ., the conduct averred in the Complaint still falls outside of the 'business of baseball' to which the Supreme Court has limited the exemption," Pls.' Opp'n SMJ 10, and contend that "[h]ere, the anticompetitive conspiracy alleged does not involve conduct that is 'central' to operating a baseball league.  To the contrary, [the] Plaintiffs have alleged a conspiracy between the League, the Mayor of San Juan, and the Franchise Defendants for the anticompetitive purpose of suppressing competition by '[removing] Plaintiffs from operating the Cangrejeros Franchise.'"  Id. at 11 (citing Compl. ¶ 50).

[16]

The Defendants argue in turn that the alleged conspiracy falls within the "business of baseball" and sets forth several cases to support their argument.  They start by laying out that "the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws."  Charles O. Finley & Co., Inc. v. Kuhn, 569 F.2d 527, 541 (7th Cir. 1978).  They then turn to two cases alleging collusion, where the Supreme Court declined to hear challenges to the antitrust exemption.

In the first case, owners of buildings with rooftop views of a professional baseball team's field brought action against the team, alleging the team was engaging in anti-competitive behavior and had breached a contract with the building owners when they began construction that would block views of the baseball field from the buildings' rooftops.  Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC, 87 F. Supp. 3d 874 (N.D. Ill. 2015).  The Rooftops argued that the baseball exemption did not apply to individual team franchises, and that if it did, the exemption did not apply here because the Rooftops' business was "not necessary to produce the game on the field."  Id. at 884.  The Court laid out that "[t]he Rooftops' first contention that the baseball exemption is inapplicable to individual team franchises is unsupported by the relevant case law.  The Toolson defendants themselves included the New York

[17]

Yankees, the Cincinnati Baseball Club, and both the owner and
general manager of the Cincinnati club." Id.  Further, the
Court laid out that "[m]ore fundamentally, . . . the Rooftops'
reading of the baseball exemption is overly narrow.  The
exemption applies to the 'business of baseball' in general, not
solely those aspects related to baseball's unique
characteristics and needs." Id.

The second case was brought by scouts that argued that MLB
was colluding to keep the scouts' salaries low because teams
were agreeing to not hire scouts already employed by other
teams.  Wyckoff v. Office of the Comm'r of Baseball, 211 F.
Supp. 3d 615 (S.D.N.Y. 2016).  Citing a previous case involving
the Chicago Cubs the Wyckoff Court observed:

> In that case, the court denied plaintiffs' application
> for a preliminary injunction on the grounds that the
> baseball exemption barred a challenge to the Chicago
> Cubs' alleged agreement with others to sell tickets to
> watch Cubs games from rooftops overlooking Wrigley
> Field. Id. at 884–85. In denying plaintiff's
> application, the court concluded that the leading
> Supreme Court cases broadly exempt the "business of
> baseball"—not discrete aspects of that business—from
> antitrust regulation. Id.

Id. at 625 (citing Right Field Rooftops, 87 F. Supp. 3d at 884-
85).  Here, the Plaintiffs claims involve an alleged conspiracy
involving an owner of a professional franchise that was
dismissed under the League's regulations.  This involves the
business of baseball.

[18]

ADD18

The Plaintiffs argument that "[t]he alleged conspiracy has nothing to do with player rules, rules of the game, or any other League rule or bylaw that could even arguably fall within the 'business of baseball' as that term has been narrowly defined by the court to limit the scope of the MLB exemption," Pls.' Opp'n SMJ 12, is overly narrow, as was the Rooftop's reading of the exemption in the <u>Right Field Rooftops</u> case.

The Sherman Act baseball exemption applies to the LBPPR and the Cangrejeros team since they are a professional baseball team, and the antitrust claims arise in the context of the business of baseball.

The baseball exemption bars any federal antitrust claims issued from the complaint, leading to dismissal of count one and count two. Count three, count four and count five, alleging state antitrust claims, are consequently dismissed based on the Supremacy Clause as the Supreme Court held in <u>Flood</u> "state antitrust regulation would conflict with federal policy and . . . national 'uniformity (is required) in any regulation of baseball.'" 407 U.S. at 284 (quoting <u>Flood</u> v. <u>Kuhn</u>, 316 F. Supp. 217, 280 (S.D.N.Y. 1970)).

This Court's subject matter jurisdiction over this case could thus only be exercised through count seven, which claims Violations of Civil Rights Act of 1871, 42 U.S.C. § 1983, and

could confer supplemental jurisdiction on count six, claiming

Contracts in Prejudice of a Third Person.

## C. "Judge shopping ain't a thing here or anywhere else."[4] The Plaintiffs' Claim of Violations of Civil Rights Act of 1871, 42 U.S.C. § 1983 Must be Dismissed Under the Doctrine of Res Judicata.

While the central element of this Complaint revolves around

the antitrust injuries that the Plaintiffs allegedly suffered,

this Court may also exercise its subject matter jurisdiction

through count seven alleging violations of Civil Rights Act of

1871, 42 U.S.C. § 1983.  The Plaintiffs' claim that the

Defendants "conspired with one another and co-conspirator Romero

Lugo, [the Mayor of San Juan] acting on behalf of the

municipality of San Juan, to deprive Plaintiffs, without due

process of law, of their property interests and rights,

privileges, and immunities secured by the United States

Constitution and laws of the United States under the color of

government action by a municipality of Puerto Rico," Compl. ¶

159, and "deprived Axon and Cangrejeros LLC, without any due

process or compensation, of their established property interest

in being the investor-operator of the Cangrejeros Franchise and

having control over the commercial exploitation of the team's

---

[4] Blue Sphere, Inc. v. Individuals, Corporations, etc. Civil
Action No. 22-cv-5599, Jan. 18, 2023, transcript at 7 (N.D.Ill.
2023)(Seager, J.).

[20]

various rights without affording them compensation or due process of law." Id.  They did so to "accomplish the objective of San Juan to suppress requests by the Franchise for various improvements in its stadium, to suppress the proposal for a private investment in the stadium, and to eliminate the possibility that the team would move to another municipality in Puerto Rico." Id. ¶ 160.

In their motion to dismiss for failure to state a claim, the Defendants argued that "Plaintiffs' action is barred by Res Judicata after [P]laintiffs lost their prior case filed in the local court of Puerto Rico."  Def's. Mot. FSC 10.  This Court is therefore "called upon to determine the preclusive effect of a judgment entered by the Puerto Rico Court of First Instance[, and] Puerto Rico law supplies the rule of decision." R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 182-83 (1st Cir. 2006) (citing Pérez-Guzmán v. Gracia, 346 F.3d 229, 233-234 (1st Cir. 2003)).

The doctrine of res judicata in Puerto Rico is inscribed in the Civil Code:

> In order that the presumption of res adjudicata may be
> valid in another suit, it is necessary that, between
> the case decided by the sentence and that in which the
> same is invoked, there be the most perfect identity
> between the things, causes, and persons of the
> litigants, and their capacity as such.

P.R. Laws Ann. tit. 31, § 3343. Thus, "a party asserting a res judicata defense under Puerto Rico law must establish three elements: (i) the existence of a prior judgment on the merits that is 'final and unappealable'; (ii) a perfect identity of thing or cause between both actions; and (iii) a perfect identity of the parties and the capacities in which they acted." R.G. Fin. Corp., 446 F.3d at 183 (citing Boateng v. InterAm. Univ., Inc., 210 F.3d 56, 61-62 (1st Cir. 2000)).

### 1. The Prior Judgment

The Defendants point out that "[o]n May 5, 2022, the San Juan Superior Court issued its Final Judgment," Def's. Mot. FSC 4, and that this is a final judgement because "[s]ince May 23, 2022, to today, [P]laintiffs never sought review or other relief from the San Juan Superior Court's judgment, which is now firm and final." Id. at 5.

The Supreme Court has held that "issues actually litigated in a state-court proceeding are entitled to the same preclusive effect in a subsequent federal § 1983 suit as they enjoy in the courts of the State where the judgment was rendered." Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 83 (1984) (citing Allen v. McCurry, 449 U.S. 90, 96 (1980)). Consequently, if perfect identity of the thing or cause between

[22]

ADD22

both actions is established, the State Court Judgement will
preclude this claim.

### 2. **The Perfect Identity of Thing or Cause Between Both Actions**

"A prior and current action will share a perfect identity
of thing if they involve the same object or matter and will
share a perfect identity of cause if they flow from the same
principal ground or origin or, put another way, if they derive
from a common nucleus of operative facts." Universal Ins. Co.
v. Office of the Ins. Comm'r, 755 F.3d 34, 38 (1st Cir. 2014)
(citing García-Monagas v. De Arellano, 674 F.3d 45, 51 (1st Cir.
2012)).  The Defendants argue that "[b]oth the prior local court
case as well as this case arise because of Axon's suspension
from the LBPPR".  Def.'s Mot. FSC 11.  They conclude their
argument by stating that "[w]hile it could be argued that both
cases are based on the same set of facts, at the very least both
cases derive from a common nucleus of operative facts." Id.

The Plaintiffs argue that "[e]ven a cursory comparison of
the claims in the narrow Superior Court Action to the very
different claims in the instant action makes it evident that
'broader and more far-reaching' conduct has been alleged here."
Pls.' Opp'n FSC 13 (citing Walsh v. Int'l Longshoremen's Ass'n.,
630 F.2d 864, 873 (1st Cir. 1980)).  They consider the Superior
Court Action to be "a simple breach of contract action

[23]

ADD23

challenging, as a violation of the League's Constitution, the League's imposition of a two-year suspension and a $5,000 fine on Axon," id., while describing the current action as "a wide-ranging case bringing federal antitrust and civil rights conspiracy claims, as well as Puerto Rico unfair competition and antitrust claims, that were not in any way presented in the Superior Court Action."  Id. at 13-14.

The Plaintiffs conflate similarity of cases and similarity of claims.  This Court does not have to consider the preclusive effect of the Superior Court Judgement on the entire case brought before it, but the preclusive effect on the cause of action that bears "perfect identity" of thing or cause between actions.  See P.R. Laws Ann. tit. 31, § 3343.

Turning to the complaint, and focusing solely on the claim of Violations of Civil Rights Act of 1871, 42 U.S.C. § 1983, the Plaintiffs allege that the "Defendants' conspiracy, with the participation of the mayor of San Juan acting on behalf of the municipality, deprived Axon and Cangrejeros LLC, without any due process or compensation, of their established property interest in being the investor-operator of the Cangrejeros Franchise and having control over the commercial exploitation of the team's various rights without affording them compensation or due process of law." Compl. ¶ 159.  Essentially, this deprivation of the "property interest in being the investor-operator of the

[24]

Cangrejeros Franchise" takes the form of Axon's suspension from his role, the same grievance at the center of the action brought to the Superior Court, and for which the court concluded that such suspension was in compliance with "the contractual due process of the law established by the parties in the Constitution of the Professional Baseball League." <u>Axon</u> v. <u>Liga De Beisbol Professional de Puerto Rico, Inc.</u>, NO. SJ-2022-CV-02802 at 12.

In the Superior Court Judgment, the Court itself compared, in Nostradamus fashion, the contractual due process case brought before it with a potential constitutional due process claim had there been a state actor involved:

> The Court must express, first, that the Professional Baseball League is a private entity. As it is well known, unless a private entity is an actor of the state, rights such as the constitutional due process of the law cannot be claimed against it. In such cases, the Supreme Court has reiterated that contractual due process of the law is what applies. This essentially means that if the parties established by contract a specific procedure to sanction one of the parties, the procedure established by contract must be followed. This makes sense because the doctrine of <u>pacta sunt servanda</u> applies. However, in this case, the Court must analyze whether the procedure to impose sanctions that the President of the Professional Baseball League carried out against Mr. Axon is the correct one, pursuant to the contract between the parties.

<u>Id.</u> at 10

At the heart of both claims lies Axon's suspension and then termination by the Professional Baseball League. After failing

[25]

ADD25

in State Court, under the theory of contractual due process, the Plaintiffs attempt to bring the same claim again under a different theory by adding the Mayor, a state actor, to their complaint.

This Court agrees that at the very least, both claims derive from a common nucleus of operative facts.  It is satisfied that the perfect identity of thing or cause between both actions is present here.

### 3. Identity of the Parties

The Plaintiffs argue first "it cannot be disputed that the parties involved in this action are not identical to the parties in the Superior Court Action. In total, there are six new Defendants in this action (Criollos Management, Inc., RA12, Inc., Indios de Mayaguez Baseball Club Inc., Gigantes de Carolina Baseball Club Inc., Leones De Ponce CF Inc. and Impulse Sports) as well as a new Plaintiff (Santurce Merchandising LLC) who were not parties to the Superior Court Action."  Pls.' Opp'n FSC 15.  Second, they argue that "Defendants have made no attempt to show that any of the new Defendants in this action were in privity with any of the parties in the prior action." Id.

The Plaintiffs, however, fail to recognize that "under Puerto Rico law, the addition of new defendants to the federal claim does not destroy the defendants' ability to raise the res

[26]

ADD26

judicata defense." <u>Rivera-Feliciano</u> v. <u>State Ins. Fund Corp</u>.,
652 F. Supp. 2d 170, 181 (D.P.R. 2009) (Pérez-Giménez, J.)
(citing <u>Baez-Cruz</u> v. <u>Municipality of Comerio</u>, 140 F.3d 24, 29
(1st Cir. 1998)).  In another case, the same argument made by
plaintiffs was met with the same response: "Plaintiffs point out
that the present action contains new parties that were not
parties in the Commonwealth Court action.  Nevertheless, the
defense of *res judicata* is applied even when the named parties
are different, as long as the real parties in interest are
identical." <u>Lugo Rodriguez</u> v. <u>Puerto Rico Inst. of Culture</u>, 221
F. Supp. 2d 229, 238 (D.P.R. 2002) (Garcia-Gregory, J.), aff'd,
98 F. App'x 15 (1st Cir. 2004) (citing <u>Arecibo Radio Corp.</u> v.
<u>Commonwealth</u>, 825 F.2d 589, 591 (1st Cir. 1987)).

Here, the real parties of interest in the Civil Rights Act
Claim, triggered by Axon's suspension, are Axon and CSBC, who
filed the action in the Commonwealth Court and in this Court
against the unlawful conduct of LBPPR and Flores in his official
capacity as President of the League and his personal capacity.

Plaintiffs fail to demonstrate that res judicata cannot
apply.  The Civil Rights Act claim stands alone and is not
intertwined with the antitrust claims.  This Court is satisfied
that the Commonwealth Judgment precludes the federal claim
through the doctrine of res judicata.

[27]

ADD27

### III. CONCLUSION

Over 100 years ago, and again 50 years ago, the Supreme Court declined to intervene in what it considered to be a congressional responsibility. "[T]he Court said in Federal Baseball in 1922 and what it said in Toolson in 1953, we say again here in 1972: the remedy, if any is indicated, is for congressional, and not judicial, action." Flood, 407 U.S. at 285. The Supreme Court also said that "[Congress] by its positive inaction, has allowed those decisions to stand for so long and, far beyond mere inference and implication, has clearly evinced a desire not to disapprove them legislatively." Id.

Decades after acknowledging that these decisions have stood for "so long," it is now apparent that a congressional intervention is unlikely. The Supreme Court may well need to take responsibility itself, or risk issuing the same decision in a century. Until then, district courts have no other choice but to apply the antitrust exemption to Professional Baseball.

This Court does not have jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 because the claims are exempt from Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 & 26), Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2), and 42 U.S.C. §§ 1983 & 1988 because of the professional baseball antitrust exemption.

Therefore, this Court does not have supplemental jurisdiction over the claims arising under the Puerto Rico antitrust law, P.R. Laws Ann. tit. 10, § 257, et seq., for violations of the Puerto Rico Fair Competition Law, P.R. Laws Ann. tit. 10, § 259, based on the Supremacy Clause.

The Civil Rights Act Claim is precluded by a prior judgement through the doctrine of res judicata and the Court declines to exercise supplemental authority on the state claim of Contracts in Prejudice of a Third Party under the Puerto Rico General Tort Statute, P.R. Laws Ann. tit. 31, § 10801.

This Court **GRANTS** the Defendants' motion to dismiss for lack of subject matter jurisdiction, ECF No. 43, with regard to the federal antitrust claims.  This Court **GRANTS** the Defendants' motion to dismiss for failure to state a claim, ECF No. 28, regarding the Civil Rights Act Claim through the doctrine of res judicata.

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[5]

---

[5] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 45 years.