# United States Court of Appeals
## For the First Circuit

No. 23-1589

CANGREJEROS DE SANTURCE BASEBALL CLUB, LLC; SANTURCE
MERCHANDISING LLC; THOMAS J. AXON,

Plaintiffs, Appellants,

v.

LIGA DE BÉISBOL PROFESIONAL DE PUERTO RICO, INC.; CRIOLLOS
MANAGEMENT, INC.; RA12, INC.; INDIOS DE MAYAGÜEZ BASEBALL CLUB
INC.; GIGANTES DE CAROLINA BASEBALL CLUB INC.; LEONES DE PONCE
CF INC.; JUAN A. FLORES GALARZA, in his official and personal
capacity; IMPULSE SPORTS ENTERTAINMENT CORPORATION,

Defendants, Appellees,

CONJUGAL PARTNERSHIP FLORES-DOE; JANE DOE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. William J. Young,* U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Gelpí, Circuit Judges.

Jeffrey K. Kessler, with whom Jeffrey J. Amato, Lauren E.
Duxstad, Robert S. Pannullo, Lauren Gailey, Carlos A.
Rodriguez-Vidal, Winston & Strawn LLP, and Goldman Antonetti &
Cordova, LLC were on brief, for appellants.

*Of the District of Massachusetts, sitting by designation.

Francisco E. Colón-Ramírez, with whom José F. Cáceres Cardona, José M. Marxuach, Colón Ramírez LLC, Cáceres Law Offices, LLC, and Marxuach LLC were on brief, for appellees.

———————————

July 21, 2025

———————————

1

**BARRON**, **Chief Judge.**   More than a century ago, the Supreme Court of the United States held that the Sherman Act does not apply to "[t]he business [of] giving exhibitions of base ball [sic]." Fed. Baseball Club of Balt. v. Nat'l League of Pro. Base Ball Clubs, 259 U.S. 200, 208 (1922).  Since then, the Court has acknowledged the "aberration[al]" and "anomal[ous]" nature of the so-called "business of baseball" exemption from this federal antitrust statute.  Flood v. Kuhn, 407 U.S. 258, 282, 285 (1972). The Court also has acknowledged the persistent criticism that shielding this "business" from that statute's reach is "unrealistic, inconsistent, or illogical."  Id. at 282 (quoting Radovich v. Nat'l Football League, 352 U.S. 445, 452 (1957)). Nonetheless, the Court has "voiced a preference that if any change is to be made, it come by legislative action."  Id. at 283.  The exemption thus remains in place.

There are questions, however, about the exemption's scope -- questions that are at the heart of this appeal.  It arises from a suit by the former owner-operator of a franchise in a professional baseball league in the Commonwealth of Puerto Rico and two limited liability corporations of which he is the sole member.  The plaintiffs named as the defendants, among others, the league's president, the league itself, and the owners of the league's other franchises.  The plaintiffs allege that, in forcing

- 3 -

the former owner of the franchise to relinquish his control over and interest in that franchise, the defendants violated the Sherman Act, a federal civil rights statute, Puerto Rico antitrust law, Puerto Rico fair competition law, and a Puerto Rico tort statute.

The United States District Court for the District of Puerto Rico dismissed the plaintiffs' Sherman Act claims based on the "business of baseball" exemption. It further ruled that the plaintiffs' claims under Puerto Rico's antitrust and fair competition laws were preempted precisely because those claims alleged conduct that constituted the "business of baseball." The District Court also dismissed on res judicata grounds the plaintiffs' remaining federal claim, which was brought pursuant to a federal civil rights law. The District Court then exercised its discretion to dismiss the plaintiffs' other Puerto Rico law claim, which was before it based on supplemental jurisdiction under 18 U.S.C. § 1367.

We agree with the District Court that the "business of baseball" exemption applies to the Puerto Rico professional baseball league involved in this suit. We also agree that the exemption applies to the conduct that the plaintiffs allege violated the Sherman Act. We thus affirm the dismissal of the Sherman Act claims.

We do not agree, however, with the reason that the District Court gave for dismissing the Puerto Rico antitrust or

fair competition claims, which was that they must be dismissed as preempted under the Supremacy Clause of the United States Constitution.  Nor do we agree with the District Court that res judicata precludes the plaintiffs' federal civil rights claim.  We therefore vacate the District Court's ruling dismissing the Puerto Rico antitrust and fair competition claims and reverse its ruling dismissing the federal civil rights claim.  Moreover, because we reverse the District Court's ruling dismissing the plaintiffs' federal civil rights claim, we also must reverse its ruling dismissing the remaining Puerto Rico law claim.

**I.**

**A.**

On July 18, 2022, the plaintiffs, Thomas J. Axon ("Axon"), Cangrejeros de Santurce Baseball Club, LLC ("Cangrejeros LLC"), and Santurce Merchandising LLC filed a complaint (the "Complaint") in the U.S. District Court for the District of Puerto Rico.  The suit named as defendants Liga de Béisbol Profesional de Puerto Rico, Inc. (the "League"); Criollos Management, Inc. (the "Criollos"); RA12, Inc. ("RA12"); Indios de Mayagüez Baseball Club, Inc. (the "Indios"); Gigantes de Carolina Baseball Club, Inc. (the "Gigantes"); Leones de Ponce CF, Inc. (the "Leones"); Impulse Sports Entertainment Corporation ("Impulse Sports"); Juan A. Flores-Galarza, in his capacity as president of the League and

his personal capacity ("Flores"); Jane Doe; and the conjugal partnership existing between Flores and Jane Doe.

The Complaint included seven counts.  It alleged: (1) unreasonable restraint of competition in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (Count One); (2) conspiracy to monopolize in violation of section 2 of the Sherman Act, 15 U.S.C. § 2 (Count Two); (3) unreasonable restraint of competition in violation of Puerto Rico antitrust law, P.R. Laws Ann. tit. 10, § 258 (Count Three); (4) conspiracy to monopolize in violation of Puerto Rico antitrust law, P.R. Laws Ann. tit. 10, § 260 (Count Four); (5) unfair methods of competition and deceptive acts and practices in trade and commerce in violation of Puerto Rico law, P.R. Laws Ann. tit. 10, § 259; P.R. Laws Ann. tit. 31, §§ 10801, 10803 (Count Five); (6) the tort of contracts in prejudice of a third person in violation of Puerto Rico's General Tort Statute, P.R. Laws Ann. tit. 31, §§ 10801, 10803 (Count Six); and (7) a violation of 42 U.S.C. § 1983 based on the defendants acting with the Mayor of San Juan to deprive the plaintiffs of their property without due process (Count Seven).

**B.**

The Complaint alleged the following facts in support of these claims.

**1.**

The League is the "only top-tier professional baseball league in Puerto Rico."[1]  In October 2019, Axon, through Cangrejeros LLC,[2] purchased operating control of one of the League's franchises, the Cangrejeros de Santurce (the "Cangrejeros Franchise").

On February 4, 2022, Axon became the sole member and chairman of Cangrejeros LLC.  That company continued to operate the Cangrejeros Franchise.  The franchise is one of the League's six, all of which are located within Puerto Rico and each of which is owned and operated separately.

The League's teams play against one another in Puerto Rico.  The League's champion plays in the Caribbean Series against teams from the Dominican Republic, Mexico, and Venezuela.

---

[1] As alleged in the complaint, two other professional leagues -- the Puerto Rico Independent Baseball League and the Liga de Béisbol Superior Doble A de Puerto Rico -- operate within Puerto Rico.  They "adhere to a semi-professional model," do not attract the same "level of player talent" as the League, and "do not compete in the same relevant markets as the League."

[2] The complaint alleged that Cangrejeros LLC was formed on September 16, 2019.  "Cangrejeros LLC was established for the purposes of (a) owning and operating the Cangrejeros de Santurce Baseball Team; and (b) transacting any and all lawful business for which a limited liability company may be organized under the Corporations Law that is incident, necessary or appropriate to accomplish the foregoing, including, without limitation, contracting for necessary or desirable services of professionals and others."

Flores was at all relevant times the president of the League. In that capacity, he oversaw all the League's operations.

The Constitution of the Liga de Béisbol Profesional de Puerto Rico, Inc. (the "League Constitution") governs the League's operations. Through Section 2.01(A) of the League Constitution, the League contractually confers the rights to operate its franchises to private investor-operators.

The League's teams compete against one another on the field, and the franchises themselves compete "for fans, in-person attendance, player talent, sponsorships, merchandise sales, radio, and streaming broadcast rights agreements." The investor-operators do not share franchise profits with one another.

As the sole member of Cangrejeros LLC, Axon invested in the Cangrejeros Franchise. He "measurably increased player quality, improved fan experience, broadened the fan base, promoted and established new broadcasts, enhanced sponsorships, and expanded merchandising opportunities." He also expanded broadcasting reach in the continental United States, commissioned a documentary film about his team, offered higher salaries to players, and proposed a preseason exhibition tournament.

**2.**

The Cangrejeros Franchise plays its home games at the Hiram Bithorn Stadium (the "Bithorn") in San Juan, Puerto Rico, by

virtue of an Agreement for the Administration and Operation of the Franchise, dated August 10, 2017.  The Bithorn is owned and administered by the Municipality of San Juan.  Miguel Romero Lugo ("Romero") was the Mayor of San Juan at the time that the Complaint was filed.  During the relevant period, the stadium suffered from, among other things, a broken scoreboard, inadequate running water, broken toilets, and a failing roof.

On February 18, 2022, Axon's counsel sent a letter to Mayor Romero on behalf of Cangrejeros LLC.  The letter addressed a leaked communication about the state of the Bithorn.  It explained that Axon's proposals to upgrade the stadium stemmed from a desire to "make the Bithorn a living and visible monument to a cornerstone of Puerto Rico's proud history and sports culture."  (Citation modified).

Axon's letter proposed that Cangrejeros LLC make repairs to the stadium through an estimated $2 million investment in exchange for an exclusive fifteen-year lease of the venue to the Cangrejeros Franchise.  Mayor Romero, on behalf of San Juan, rejected this proposal in a press release.

On March 8, 2022, following Romero's press release, Cangrejeros LLC informed Flores that the conditions at the Bithorn necessitated considering relocating the franchise to another stadium in Puerto Rico.  Cangrejeros LLC indicated that an option

had arisen for the Cangrejeros Franchise to play its games at a stadium in better shape in the Municipality of Humacao.

At a League Board meeting on February 22, 2022, Axon advised the teams and the League that he would no longer accept a municipal sponsorship from San Juan for the Bithorn. He believed that such a sponsorship would not be adequate to ensure that necessary improvements to the stadium would be made.

In a press conference held on March 10, 2022, Axon announced this same message publicly. In this public statement, he referenced the Bithorn's defects, the negative impact of these defects on player performance and fan engagement, and San Juan's failure to correct these defects or provide adequate funds to do so. He further stated that San Juan's repeated failure to invest in the Bithorn and San Juan's unwillingness to collaborate with the Cangrejeros Franchise on proposed solutions had necessitated the contemplated movement of the team to a different stadium in another municipality.

Axon hoped the press conference would encourage the League to work with him to have San Juan fulfill its obligations to improve the stadium or, if San Juan continued to resist, to move the team to another municipality. Acting in concert with Mayor Romero and with the agreement of the other investor-operators, Flores soon thereafter took steps to force Axon to relinquish his control over the Cangrejeros Franchise.

Flores sent Axon a letter dated March 14, 2022. It indicated that Axon had engaged in conduct "detrimental to baseball" and to the League in violation of § 8.02 of the League Constitution. Flores then ordered the Cangrejeros Franchise to remove Axon both from the League Board and as a shareholder of the Cangrejeros Franchise and threatened to terminate the investor-operator agreement between Cangrejeros LLC and the League.

Flores also wrote to the Municipality of Humacao. His letter stated that the League did not endorse relocating the Cangrejeros Franchise to Humacao.

Cangrejeros LLC responded to Flores through a letter, dated March 17, 2022. In that letter, Cangrejeros LLC challenged the assertion that Axon had engaged in any acts detrimental to baseball or the League.

On March 18, 2022, Flores called a special meeting of the League Board to discuss the Cangrejeros Franchise and sanctions against Axon. Axon requested to attend, but the League Board met without him.

On March 29, 2022, Flores informed Axon that by agreement of the League Board, made up primarily of the competing investor-operators who controlled the other franchises, Axon had been suspended from all functions and participation in the Cangrejeros Franchise and the League for two years. He further

informed Axon that he was fined $5,000 and placed on probation for one year after expiration of the suspension.

### 3.

After learning of these actions, Axon sought a preliminary injunction and declaratory judgment in the Superior Court of San Juan against the League and Flores to prevent his suspension from taking effect. Axon v. Liga De Beisbol Pro. de Puerto Rico, Inc., No. SJ-2022-CV-02802 (Super. Ct. P.R. May 5, 2022). Axon alleged that permitting his suspension to take effect would freeze the Cangrejeros Franchise's access to capital and result in the cessation of club operations.

The Superior Court held a hearing on Axon's motion for a preliminary injunction on April 22, 2022. Section 3.01 of the League Constitution states that "shareholders and official representatives must be accepted by the Board" to be "members" of the League. The Superior Court interpreted this provision to mean that Axon was not a "member" of the League at the time of his suspension.[3] The Superior Court then concluded that because Axon

---

[3] This outcome, according to the pleadings, resulted from Axon inadvertently removing himself from the League Board. On February 14, 2022, Axon's personal counsel informed Flores that Lino Rivera, the Chief Operating Officer of the Cangrejeros Franchise, and Saúl Suárez, who the Complaint describes as a "Cangrejeros employee," would be the franchise's representatives to the League Board. On February 22, 2022, the League Board confirmed Rivera and Suárez as members representing the Cangrejeros Franchise on the League Board. Axon's counsel believed

was not a member of the League, he was not entitled to the protections and procedures of § 3.05 and § 3.06 of the League Constitution. Those provisions specify the grounds for termination of membership and procedures for member separation. The Superior Court thus ruled that the League Board had the power to suspend Axon, as a nonmember of the League, and that Axon was not entitled to protections under the League's constitution. Accordingly, the Superior Court denied Axon's motion for a preliminary injunction.

**4.**

Following the Superior Court's ruling, Flores informed the plaintiffs on May 17, 2022, that the League was seizing the interests of Cangrejeros LLC in the Cangrejeros Franchise pursuant to § 3.06 of the League Constitution. Flores indicated to them that Axon's filing of a legal action -- in which Axon allegedly made false representations regarding his membership in the League -- violated the investor-operating agreement and permitted the League Board to permanently terminate the interests of Cangrejeros LLC in the Cangrejeros Franchise.

The League Board met virtually on May 31, 2022. The attendees included many of the defendants: Raul Rodríguez of the

---

that Axon held permanent Board membership in his role as sole member of Cangrejeros LLC; however, the League Board's confirmation of Rivera and Suárez as representative members in fact revoked Axon's position on the League Board.

Criollos; José Feliciano and Juan Carlos Ramírez of the Indios; Javier Hernández of the Gigantes; Roberto Alomar and Marisol Irizarry of RA12; and Oscar Misla of the Leones.

The meeting also included Rivera and Suárez as representatives of the Cangrejeros Franchise. The League Board denied Axon's request to testify at the meeting.

Rivera argued at the meeting on behalf of Cangrejeros LLC. He indicated that Axon would accept a two-year suspension in exchange for the League not terminating the investor-operator rights of Cangrejeros LLC. The League Board, however, voted to terminate the investor-operator agreement of Cangrejeros LLC and to seize all of the plaintiffs' economic and operation rights in the franchise without any compensation.

On June 5, 2022, Flores reported that the League was seeking a new investor-operator for the Cangrejeros Franchise. Flores acknowledged that two entities had expressed interest in becoming the investor-operator for the franchise in February 2022, several months before Axon had been suspended.

On or about June 13, 2022, the League announced that Impulse Sports had been selected as the new investor-operator of the Cangrejeros Franchise. Impulse Sports had filed for incorporation in Puerto Rico on May 20, 2022, eleven days before the League Board terminated Cangrejeros LLC's interests in the Cangrejeros Franchise as an investor-operator.

After Impulse Sports gained control of the Cangrejeros Franchise, it publicized its intention to strengthen the Franchise's ties to Mayor Romero.  On July 7, 2022, when Impulse Sports was introduced as the new owner of the Cangrejeros Franchise, Mayor Romero participated in the announcement and sat alongside Impulse Sports in a show of government support.

At the press conference, Impulse Sports stated that it would be "strengthening ties with the mayor."  In response, Mayor Romero stated that the Bithorn stadium would be made ready for the upcoming season.

## C.

Some weeks after the press conference, Axon, Cangrejeros LLC, and Santurce Merchandising LLC filed the Complaint that gives rise to this appeal in the United States District Court for the District of Puerto Rico.  On September 12, 2022, the League, later joined by some of the competing franchises, moved to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  That motion argued (1) that the plaintiffs are contractually bound to litigate their claims in the local courts of Puerto Rico; and (2) that the plaintiffs' action is barred by res judicata after the plaintiffs lost their prior case filed in the local court of Puerto Rico.

Then, on October 27, 2022, the defendants moved under Federal Rule of Civil Procedure 12(b)(1) to dismiss the Complaint

for lack of subject matter jurisdiction.  They argued that the District Court lacked subject matter jurisdiction over the federal antitrust claims, because the relevant conduct constituted the "business of baseball," and the state claims brought under Puerto Rico antitrust law and fair competition law, for the same reason. The plaintiffs timely opposed these motions.

On June 27, 2023, the District Court granted the defendants' motions and dismissed the case.  It dismissed for want of jurisdiction the federal antitrust claims and the claims brought under Puerto Rico antitrust and fair competition laws because of the "business of baseball" exemption.  It dismissed the § 1983 claim for failure to state a claim based on the doctrine of res judicata.  It then declined to exercise supplemental jurisdiction over the remaining Puerto Rico law claim.

With respect to the federal antitrust claims, the District Court noted that it was "boldly go[ing] where no lower court has gone before" by applying the "business of baseball" exemption to the League.  The District Court explained that it was doing so because it rejected the plaintiffs' arguments that the baseball exemption applies only to Major League Baseball (MLB) and MLB's direct affiliates, thereby becoming the first lower court since <u>Federal Baseball</u> to hold that the exemption may apply to a professional baseball league other than MLB or an affiliate of it.

The District Court then addressed, still with respect to the Sherman Act claims, whether "the conduct averred in the Complaint still falls outside of the 'business of baseball'" because of the nature of the alleged conduct.  The plaintiffs argued that the conduct did.  The District Court rejected that argument and reasoned that:

> the [p]laintiffs['] claims involve an alleged conspiracy involving an owner of a professional franchise that was dismissed under the League's regulations.  This involves the business of baseball.  . . .  The Sherman Act baseball exemption applies to the [League] and the Cangrejeros [Franchise] since they are a [sic] professional baseball team, and the antitrust claims arise in the context of the business of baseball.

After concluding that the baseball exemption barred the Sherman Act claims, the District Court also dismissed the claims under Puerto Rico antitrust and fair competition law.  As to those claims, the District Court stated, in full:

> [The Puerto Rico antitrust and fair competition claims] are consequently dismissed based on the Supremacy Clause as the Supreme Court held in Flood [that] "state antitrust regulation would conflict with federal policy and . . . national 'uniformity (is required) in any regulation of baseball.'" 407 U.S. at 284 (quoting Flood v. Kuhn, 316 F. Supp. 217, 280 (S.D.N.Y. 1970)).

(Second alteration in original).  The Court thus dismissed Counts Three, Four, and Five.

The District Court next addressed the plaintiffs' § 1983 claim and concluded that claim "must be dismissed under the doctrine of res judicata." (Citation modified). The District Court applied § 3343 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 3343, and noted that to satisfy § 3343, a party must show "(i) the existence of a [final] judgment on the merits . . .; (ii) a perfect identity of thing or cause between both actions; and (iii) a perfect identity of the parties and the capacities in which they acted." (Quoting R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 183 (1st Cir. 2006)). The District Court concluded that the earlier judgment from the San Juan Superior Court satisfied these requirements and thus barred adjudication of the plaintiffs' § 1983 claim.

Having dismissed all the plaintiffs' claims arising under federal law, the District Court declined to exercise supplemental jurisdiction over the remaining claim arising under Puerto Rico law, which was a contract law claim, and dismissed the case. See Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 257 (1st Cir. 1996); 28 U.S.C. § 1367. The plaintiffs thereafter timely appealed the District Court's judgment.

## II.

We review de novo a district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6) or for lack of subject matter jurisdiction under Rule 12(b)(1). Legal

Sea Foods, LLC v. Strathmore Ins. Co., 36 F.4th 29, 34 (1st Cir.
2022); Lyman v. Baker, 954 F.3d 351, 359 (1st Cir. 2020). Although
dismissals under Rules 12(b)(1) and 12(b)(6) are "conceptually
distinct, . . . the same basic principles apply in both
situations." Lyman, 954 F.3d at 359 (quoting Hochendoner v.
Genzyme Corp., 823 F.3d 724, 730 (1st Cir. 2016)).

        In both contexts, we accept as true the complaint's well-
pleaded factual allegations and draw all reasonable inferences in
the plaintiffs' favor. Id.; Cheng v. Neumann, 51 F.4th 438, 443
(1st Cir. 2022). We disregard "conclusory legal allegations" and
factual assertions that are "too meager, vague, or conclusory to
remove the possibility of relief from the realm of mere
conjecture." Legal Sea Foods, 36 F.4th at 33 (first quoting
Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir.
2015); and then quoting SEC v. Tambone, 597 F.3d 436, 442 (1st
Cir. 2010) (en banc)).

        To survive a Rule 12(b)(6) motion, "a complaint must
contain sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.'" Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible
"when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable for
the misconduct alleged." Id.

Under Rule 12(b)(1), we also disregard "statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements," and consider whether the non-conclusory, non-speculative facts support the existence of subject matter jurisdiction. Lyman, 954 F.3d at 360 (quoting Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012)). We may consider information attached to or incorporated into the complaint, along with facts subject to judicial notice. Id.

### III.

The plaintiffs contend that the District Court erred in dismissing their Sherman Act claims because the "business of baseball" exemption applies only to conduct that involves MLB and its affiliates. They argue in the alternative that the District Court erred in dismissing the claims because the nature of the specific conduct alleged would not constitute the "business of baseball" even if MLB and its affiliates engaged in it. We are not persuaded by either contention.[4]

### A.

The plaintiffs bring two claims under the Sherman Act. They bring the first under section 1 of that statute. That section

---

[4] The District Court held that the applicability of the exemption deprived it of subject matter jurisdiction and dismissed the federal antitrust claims under Rule 12(b)(1). The plaintiffs

makes unlawful "[e]very contract . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.  In support of this claim, the plaintiffs allege that the "[d]efendants have entered into a continuing conspiracy in unreasonable restraint of trade to boycott and exclude [the plaintiffs] from the relevant markets and to replace them with a more malleable competitor."  They also allege that the conspiracy "will reduce product quality and output in the relevant markets" and that "[i]t also has no procompetitive justification."

The plaintiffs bring their second Sherman Act claim under section 2 of that statute.  That section provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or

---

contend on appeal that "there is no jurisdictional issue in play" because the exemption is a merits issue, not a jurisdictional one. We agree.  See Garber v. Off. of the Comm'r of Baseball, 120 F. Supp. 3d 334, 339 (S.D.N.Y. 2014) ("[T]he scope of the baseball exemption is not a jurisdictional issue.  It is a threshold merits issue."); Arbaugh v. Y&H Corp., 546 U.S. 500, 511 (2006) ("Subject matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as the predicate for relief -- a merits-related determination." (quoting 2 Moore's Federal Practice § 12.30[1] (3d ed. 2005))).  To the extent that the Eleventh Circuit has suggested that the exemption imposes a jurisdictional bar, Pro. Baseball Sch. & Clubs, Inc. v. Kuhn, 693 F.2d 1085, 1085 (11th Cir. 1982), we disagree.  We thus proceed to address whether the plaintiffs' claims must be dismissed pursuant to Rule 12(b)(6).  See Lin v. TipRanks, Ltd., 19 F.4th 28, 36 (1st Cir. 2021) ("We, of course, may affirm the District Court's ruling on any ground manifest in the record.").

with foreign nations, shall be deemed guilty of a felony" and subject to a fine.  15 U.S.C. § 2.

The plaintiffs allege that the defendants violated section 2 of the Sherman Act because they "entered into a continuing combination or conspiracy with the specific intent of acquiring and maintaining monopoly power in the relevant markets." They also allege that the "league and its investor-operators have a 100 percent share of the relevant markets and exercise their monopoly power by controlling entry into those markets" and that the defendants unlawfully "exclud[ed] [the plaintiffs] from the relevant markets."

**B.**

The plaintiffs are right that, after Federal Baseball, "[n]o other case has ever broadly interpreted the exemption to apply to entities not part of MLB."  They also are right that the exemption has received significant criticism.  Flood, 407 U.S. at 282.  But neither the exemption's past application nor the longstanding criticism that it has engendered supports the conclusion that it applies only to MLB and its affiliates and so, for that reason alone, not the League.

**1.**

Federal Baseball did not describe the "business of baseball" exemption in terms of the specific professional baseball leagues that were parties to that case or to any specific league

at all.  259 U.S. at 208-09.  It defined the exemption in terms of an activity -- the activity being "the business [of] giving exhibitions of base ball [sic]."  Id. at 208.

The Supreme Court's subsequent treatment of the exemption has been no different.  In Toolson v. New York Yankees, Inc., for example, the Court characterized its own precedent as holding "that the business of providing public baseball games for profit between clubs of professional baseball players was not within the scope of federal antitrust laws."  346 U.S. 356, 357 (1953) (emphasis added) (citing Fed. Baseball, 259 U.S. 200). Similarly, in Flood, the Court quoted that same language to reaffirm the exemption, 407 U.S. at 273 (quoting Toolson, 346 U.S. at 357), and so again made clear that the exemption protects the "business of providing public baseball games for profit between clubs of professional baseball players," see id. (quoting Toolson, 346 U.S. at 357), rather than a particular entity engaged in that business.

The plaintiffs point to language from National Collegiate Athletic Ass'n v. Alston that observes that the "[Supreme] Court has refused to extend Federal Baseball's reasoning to other sports leagues."  594 U.S. 69, 95 (2021).  In context, though, the Court was referring in that passage to leagues involved in sports other than baseball, not professional baseball leagues other than MLB.  See, e.g., United States v. Int'l Boxing

Club of N.Y., 348 U.S. 236, 242, 245 (1955) (recognizing the
exemption applies to the "business of baseball" and declining to
extend exemption to professional boxing without mentioning the
MLB); Radovich, 352 U.S. at 451 (noting precedent "restrict[ed]
Toolson's coverage to baseball" but not mentioning MLB); Haywood
v. Nat'l Basketball Ass'n, 401 U.S. 1204, 1205 (1971) (noting that
"[b]asketball . . . does not enjoy exemption from the antitrust
laws" notwithstanding the Court's "decisions exempting baseball
from the antitrust laws" (emphases added)); see also United States
v. Shubert, 348 U.S. 222, 229-30 (1955) (characterizing the
exemption as applying to "the baseball business" and declining to
extend the exemption to other live presentations).

The plaintiffs also point to language from Radovich that
indicates that the Court "specifically limit[ed] the rule" of
Federal Baseball "to the facts there involved," 352 U.S. at 451.
They contend that this language shows that the exemption does not
apply to a league -- like the one involved in this case -- that
was not a party to Federal Baseball itself or a successor to such
a party.

Radovich referred, however, to "the business of
organized professional baseball" as being synonymous with "the
facts there involved." Id. As we have explained, the Court has
consistently defined the "business of baseball" in terms of the
nature of activity undertaken, rather than the identity of the

entity engaged in that activity.  So, we do not understand Radovich
to hold that the "business of baseball" concerns only the exact
conduct involved in Federal Baseball and, for that reason, to
exclude conduct involving the League.  Indeed, Flood held that the
MLB's reserve clause constituted the "business of baseball," 407
U.S. at 285, even though that league's reserve clause obviously
was not at issue in Federal Baseball.

**2.**

The plaintiffs separately argue that the exemption
cannot apply to the League because "the Supreme Court's
justification for continuing to adhere to the Federal Baseball
exemption in Flood was stare decisis -- a rationale that only
applies to MLB's reliance interest."  The need to protect the MLB's
reliance interest, however, was only one of the grounds that the
Court gave in Flood for reaffirming the exemption.

In discussing Toolson, the Flood Court noted
"Congressional awareness for three decades of the Court's ruling
in Federal Baseball, coupled with congressional inaction" and "[a]
professed desire that any needed remedy be provided by legislation
rather than by court decree."  407 U.S. at 273-74.  The Court noted
as well that Federal Baseball had been "cited, not unfavorably,
with respect to the practice of law; with respect to out-of-state
contractors; and upon a general comparison reference."  Id. at
271-72 (citations omitted).  Additionally, the Court in Flood

indicated that the exemption "rests on a recognition and an acceptance of <u>baseball</u>'s unique characteristics and needs."  <u>Id.</u> at 282 (emphasis added).

That last rationale focuses on the attributes of the professional sport of baseball, not the specific professional league that was a party to <u>Flood</u>.  The various grounds offered in <u>Flood</u> for supporting the exemption therefore fail to support the plaintiffs' argument that the exemption's "rationale . . . only applies to MLB's reliance interest."  Accordingly, we reject the plaintiffs' contention that the Supreme Court's only justification for maintaining the exemption was MLB's reliance interest.

### c.

The plaintiffs alternatively contend that, even if the exemption applies to the League, the exemption "does not cover every type of anticompetitive conspiracy engaged in by a baseball league and its teams simply because the commerce restrained happens to be part of the baseball business."  They go on to argue that this "limited" exemption applies only to activities that are "'central' to organizing and operating a baseball league" and that the alleged conspiracy here does not fall within that more limited conception of the exemption's scope.  As we will next explain, however, we conclude that, even under the "central to" formulation, the plaintiffs have failed to show that the District Court erred

in holding that the exemption applies to the plaintiffs' Sherman Act claims.

## 1.

Before the District Court, the defendants took a seemingly sweeping view of the exemption's scope. They appeared to argue that, insofar as the exemption applies to the League and not just MLB and its affiliates, it applies in this case simply because the League is itself a professional baseball league. As the defendants put it below, "[T]here is no doubt that [the League] is a professional baseball league in Puerto Rico . . . and thus the exemption applies."

The plaintiffs responded by arguing that "the mere fact that the parties are involved in the baseball business . . . does not shield all of [the d]efendants' conduct under the . . . exemption." They argued that the "exemption only applies to protect conduct that qualifies as the 'business of baseball,' in the narrow manner by which that term has been defined by the courts." The plaintiffs then asserted that the "business of baseball" only includes conduct central to the operation of professional baseball leagues -- and so not to all conduct in which the League engages -- as this understanding "is consistent with how courts have interpreted the exemption for decades."

In fleshing out this argument, the plaintiffs cited lower court decisions from other circuits that, in their view,

apply the exemption in this more limited manner.  See, e.g., Henderson Broad. Corp. v. Hous. Sports Ass'n, Inc., 541 F. Supp. 263, 265 (S.D. Tex. 1982) ("[B]roadcasting is not central enough to baseball to be encompassed in the baseball exemption.").  The plaintiffs then contended that the "anticompetitive conspiracy alleged" here falls outside the scope of the exemption because it "does not involve conduct that is 'central' to operating a baseball league."  In their view, the alleged conspiracy "has nothing to do with player rules, rules of the game, or any other League rule or bylaw that could even arguably fall within the 'business of baseball.'"  (Emphasis added).

The District Court did not adopt the defendants' seemingly categorical view that the exemption applies to any conduct by the League.  It explained that the exemption applied in this case because the "alleged conspiracy involv[es] an owner of a professional franchise that was dismissed under the League's regulations" and so "involves the business of baseball."  It then also observed that "the antitrust claims arise in the context of the business of baseball."

The District Court relied on two of the precedents that the defendants cited, namely Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC, 87 F. Supp. 3d 874 (N.D. Ill. 2015), and Wyckoff v. Office of the Commissioner of Baseball, 211 F. Supp. 3d 615 (S.D.N.Y. 2016).  In concluding that the exemption applied,

the courts in those cases considered the nature of the conduct alleged to violate the Sherman Act and determined that it was "central to the public display of baseball games," Right Field Rooftops, 87 F. Supp. 3d at 885, or "an integral part of" and "central to the 'business of baseball,'" Wyckoff, 211. F. Supp. 3d at 626-27.  They also contrasted conduct of that sort with conduct that falls outside the exemption because it is "incidental" or "wholly collateral to" to the public display of baseball games. Id. at 626 (first quoting Right Field Rooftops, 87 F. Supp. 3d at 885; and then quoting City of San Jose v. Off. of the Comm'r of Baseball, 776 F.3d 686, 690 (9th Cir. 2015)).

It is arguable that, by invoking Wyckoff and Right Field Rooftops, the District Court implicitly deemed the alleged anti-competitive conduct here to be "central" or "integral to" the public display of baseball games and so, for that reason, the "business of baseball."  The District Court did not expressly characterize the conduct in those terms, however.  Nor did it elaborate on why either of the cases it cited supported the legal proposition that claims fall within the exemption if they merely "arise in the context of the business of baseball," "involv[e] an owner of a professional [baseball] franchise," or "involve[e] . . . [l]eague regulations."  It also did not otherwise explain why those cases show that the exemption applies to the alleged conspiracy here, except by stating that "the

[p]laintiffs['] argument . . . is overly narrow, as was the [plaintiffs'] reading of the exemption in the <u>Right Field Rooftops</u> case."

In our view, therefore, it is not entirely clear that the District Court assessed the conduct alleged to violate the Sherman Act here along a "central to" versus "wholly collateral to" axis. As a result, it is not entirely clear that, in ruling that the exemption applied, the District Court determined that the conduct satisfied the "central to" test that the plaintiffs ask us to embrace.

Nonetheless, we may affirm the District Court's dismissal of the plaintiffs' Sherman Act claims on any ground manifest in the record. <u>See</u> <u>Brox</u> v. <u>Hole</u>, 83 F.4th 87, 98 (1st Cir. 2023). And, as we will next explain, we conclude that, even if we were to apply the "central to" test that the plaintiffs derive from the lower court precedents, the plaintiffs' arguments on appeal fail to show that, under that test, the exemption has no application here.

**2.**

We recognize that extensions of the exemption beyond the factual context that gave rise to it are not permitted, because the Supreme Court has "specifically limit[ed] the rule" of <u>Federal Baseball</u> "to the facts there involved." <u>Radovich</u>, 352 U.S. at 451. And while <u>Radovich</u> makes clear that those "facts" are ones

that constitute "the business of baseball," id., rather than the precise facts involved in Federal Baseball itself, we can see how a decision to extend the exemption to allegedly anti-competitive conduct by a professional baseball league or its affiliates with respect to broadcasting agreements, see Henderson, 541 F. Supp. at 265, or agreements with concessionaires at league games, see Twin City Sportservice, Inc. v. Charles O. Finley & Co., 512 F.2d 1264 (9th Cir. 1975), might be thought to violate that directive.

Such conduct is arguably "incidental" to the business of putting on games for public display in a way that, say, a professional baseball league's enforcement of a reserve clause in players' contracts is not, see Flood, 407 U.S. at 282. The latter type of league conduct -- unlike the former type -- directly impacts the product on the field because it directly impacts who the players on the field are.

Moreover, precisely because the former type of conduct does not have such a direct on-the-field impact, extending the exemption to such conduct has no obvious stopping point. It is not easy to distinguish the markets for broadcast rights in professional baseball games or concessions in the live exhibition of such games from the markets in trading cards, video games, or league-related merchandise.

Extending the exemption to the former type of conduct thus risks expanding an already much-criticized exemption to wide

swaths of economic activity just because such activity relates in some way to professional baseball.  No similar risk of exemption creep appears to be presented by applying the exemption to the factual context presented here.  Such an application merely shields from federal antitrust scrutiny the League's decisions to enforce its established rules for determining who will run, own, and control the League's own teams.

It is true, of course, that owners -- unlike players -- do not take the field.  But the plaintiffs do not appear to be of the view that this fact in and of itself precludes the exemption's application.  But see Postema v. Nat'l League of Pro. Baseball Clubs, 799 F. Supp. 1475, 1489 (S.D.N.Y. 1992) (explaining that "baseball's relations with non-players are not a unique characteristic or need of the game" and thus do not fall within the scope of the exemption), rev'd on other grounds, 998 F.2d 60 (2d Cir. 1993).  As the plaintiffs recognize, the Wyckoff court held that professional baseball league personnel -- in that case, team scouts -- can be involved in the "business of baseball" due, in part, to the integral role that they play in selecting the talent that then participates on the field during those games.  See 211 F. Supp. 3d at 626-27.  Yet, scouts do not directly participate in the public display of the game itself, and the plaintiffs do not develop an argument that Wyckoff was wrongly

decided because it treated scouts as being involved in the "business of baseball."

The plaintiffs do attempt to distinguish Wyckoff. They do so on the ground that a scout's "role [is] 'so extraordinarily unique' to the game that it [is] 'an integral part of' and 'central to the "business of baseball."'" (Quoting id.). But that ground for distinction fails because Wyckoff did not limit the applicability of the exemption to conduct that is -- or roles that are -- "'extraordinarily unique' to the game of baseball." Id. at 626. In referring to that strict potential formulation of the "central to" test, the Wyckoff court was just quoting the characterization that the plaintiffs there had offered of the role that scouts played. Id.

In addition, Wyckoff ultimately concluded that the exemption applied because the scouts' role was not "incidental" to the "business of baseball," and not because that role was "extraordinarily unique" to baseball. See id. The court came to that conclusion, in part, because "scouts' identification and targeting of particular players greatly influences the Franchises' decisions about which players to hire and what team to field." Id. at 626-27.

That reasoning is no less applicable here. If an individual's role is "central" to, or at least more than "incidental" to, the public display of baseball games when that

individual's role "greatly influences the Franchise's decisions about which players to hire and what teams to field," id., then it is hard to see why the role of an owner of a professional baseball franchise would be "incidental."  Owners of professional baseball franchises -- from Walter O'Malley, who owned the Brooklyn Dodgers when the team signed Jackie Robinson, to Harry Frazee, who owned the Boston Red Sox when the team traded Babe Ruth -- have been foundational figures in the development of professional baseball precisely because of their decisions "about which players to hire and what teams to field," id.

The plaintiffs themselves appear to recognize the centrality and importance of owners to, as Toolson put it, the "business of providing public baseball games for profit between clubs of professional baseball players."  346 U.S. at 357.  They allege in their own Complaint that the former owner who was ousted here "measurably increased player quality," "invested resources to entice higher-quality baseball players to play," and "proposed essential renovations to improve the conditions of the stadium for fans."

We recognize that, in Piazza v. Major League Baseball, 831 F. Supp. 420 (E.D. Pa. 1993), the district court suggested that "the market for ownership interests in existing baseball teams" may not fall within the scope of the exemption.  Id. at 439-440; see also id. at 441 ("[A]cquiring an ownership interest

in a team may very well be no more unique to the exhibition of baseball games than is moving players and their equipment from game to game."). But, in that case, the court also acknowledged that ownership decisions that "implicate matters of league structure . . . [could] be covered by the exemption." Id.

In any event, the plaintiffs do not appear to deny that a league's efforts to enforce its rules about team ownership may fall within the exemption. The plaintiffs contend only that the enforcement of the rules here is not within the exemption because, as they described it to the District Court, the enforcement does not involve a "League rule or bylaw that could even arguably fall within the 'business of baseball.'" They do not explain, though, why the League rules at issue here are not "central" to the business of a professional baseball league. They instead merely assert -- in conclusory fashion -- that the rule that the League is alleged to have enforced in harming the plaintiffs is not within the "business of baseball" because it "had nothing to do with the necessary rules for operating a baseball league or its 'unique characteristics.'" Yet, as we have explained, a professional baseball league's established rules for determining who may operate one of the teams in a baseball league would appear to have quite a lot to do with "operating a baseball league."

The plaintiffs also invoke an amicus brief filed by the U.S. Department of Justice (DOJ) in another case that touched on

the scope of the exemption.  In that filing, the DOJ advanced the view that the challenged conduct in a case must be "central to the business of offering professional baseball games to the public" to fall within the scope of the exemption.  Brief of the United States as Amicus Curiae in Support of Neither Party at 7, Nostalgic Partners v. Off. of the Comm'r of Baseball, 637 F. Supp. 3d 45 (S.D.N.Y. 2022) (No. 21-cv-10876).

We do not take issue here, however, with the "central to" formulation.  We take issue only with the plaintiffs' arguments that the conduct here falls outside the exemption because it fails the "central to" test.  It is thus significant to us that the DOJ does not suggest in the filing at issue that the efforts of a professional baseball league to enforce its own rules for owning and controlling one of its teams is merely incidental to that business.

### 3.

Insofar as the plaintiffs mean to make the distinct argument that the exemption does not apply here because the alleged conspiracy "involv[ed] the Mayor of San Juan" -- and so involved someone who was not employed by the League -- we also are not persuaded.  The plaintiffs' Complaint alleges that Mayor Romero conspired with the League to "force Axon to relinquish his control over the Cangrejeros Franchise" because Axon had criticized the city's "repeated failure to invest in the Bithorn [stadium] and

San Juan's unwillingness to collaborate with the Cangrejeros Franchise" and because Axon had threatened to move the team to another city. The Complaint further alleges that the Bithorn is "emblematic of the island's rich baseball history" and that the stadium conditions affected "players, fans, and sponsors." Moreover, the plaintiffs acknowledge that "franchise relocation rules" are covered by the exemption.

We do not see how the involvement of the Mayor of San Juan -- the city that owns the Bithorn stadium -- makes the challenged conduct in this case any less "central" to the operations of the League, given the evident centrality of franchise location and a franchise's stadium to the "public display of baseball games." In addition, the plaintiffs identify no authority that suggests that a conspiracy by a professional baseball league's franchise owners that constitutes the "business of baseball" necessarily ceases to constitute such "business" so long as a single participant in the conspiracy is not a member or employee of the league. See Major League Baseball v. Crist, 331 F.3d 1177, 1184 (11th Cir. 2003) (rejecting argument that the involvement of public entities in a professional baseball league's activity would take that activity out of the scope of the exemption).

### D.

Stepping back, we recognize that the "business of baseball" exemption has its origins in the Supreme Court's

determination that professional baseball games "are purely state affairs," Fed. Baseball, 259 U.S. at 208, for purposes of assessing Congress's powers under the Commerce Clause.  We recognize as well that modern Commerce Clause doctrine does not support that same conclusion.  Indeed, it offers even less support for the conclusion that Congress's Article I powers do not extend to the sport of baseball even though they extend to other sports.

Nonetheless, the "business of baseball" exemption "has survived the Court's expanding concept of interstate commerce," and the Court has declined to overrule the relevant precedent despite acknowledging "that it [is] out of step with subsequent decisions reflecting present-day concepts of interstate commerce." Flood, 407 U.S. at 275, 282; see also id. at 286 (Douglas, J., dissenting) (describing the Court's 1922 view of commerce as "narrow" and "parochial" and recognizing that "the whole concept of commerce has changed").  We thus must apply that exemption, which, as we have explained, is for the "business of baseball" rather than for any specific professional baseball league.  For the reasons we have set forth, we reject the plaintiffs' challenge to the District Court's decision to dismiss the Sherman Act claims based on the "business of baseball" exemption.

## IV.

We now turn to the plaintiffs' challenge to the District Court's dismissal of the two claims that they brought under Puerto

Rico's antitrust law, P.R. Laws Ann. tit. 10, §§ 258, 260, and the one claim that they brought under Puerto Rico's fair competition law, P.R. Laws Ann. tit. 10, § 259.  In these three claims, the plaintiffs challenge the same conduct that provides the basis for their two Sherman Act claims.

In addressing these three Puerto Rico law claims, the District Court noted that "[t]he baseball exemption bars any federal antitrust claims issued from the complaint . . . ."  It then went on to conclude that the claims "are consequently dismissed based on the Supremacy Clause as the Supreme Court held in Flood [that] 'state antitrust regulation would conflict with federal policy and . . . "national uniformity (is required) in any regulation of baseball."'"  (Quoting Flood, 407 U.S. at 284).

The plaintiffs argue that the District Court erred in so ruling.  The defendants defend the District Court's reasoning and argue that the "antitrust claims under Puerto Rico law are preempted by the Supremacy Clause (or the Commerce Clause)."

The defendants contend that "exempting the business of baseball from federal antitrust law . . . does not mean it is subject to state antitrust law."  In support of this contention, they point out that the Supreme Court in Flood, 407 U.S. 258, and the Eleventh Circuit in Major League Baseball v. Crist, 331 F.3d 1177, dismissed the state antitrust claims in those cases after concluding that the "business of baseball" exemption applied.  They

also contend that the reasoning of those cases applies here because the League is engaged in the "business of baseball."

The defendants separately contend, too, that "[t]he Commerce Clause prohibits the application of state antitrust laws" in professional sports generally. (Citing Robertson v. Nat'l Basketball Ass'n, 389 F. Supp. 867, 880 (S.D.N.Y. 1975)). They urge us to affirm the dismissal of these three claims on that alternative basis as well.

The disagreement between the parties appears to stem primarily from their divergent views about Flood's treatment of the state law claims at issue there. We therefore begin by reviewing the relevant analysis in Flood, before then explaining why the analysis there does not support the District Court's dismissal ruling. Accordingly, for the reasons we will set forth, we vacate the portion of the District Court's judgment dismissing the claims brought under Puerto Rico's antitrust and fair competition laws and remand for further proceedings.[5]

---

[5] The District Court appears to have held that the applicability of the exemption deprived it of jurisdiction over the claims brought under Puerto Rico's antitrust and fair competition laws and to have dismissed those claims under Rule 12(b)(1). As we have explained, however, we disagree that the exemption presents a jurisdictional bar rather than a threshold merits issue. See Garber, 120 F. Supp. 3d at 339; Arbaugh, 546 U.S. at 511. We thus proceed to evaluate the dismissal of these claims under Rule 12(b)(6). See Lin, 19 F.4th at 36. For our current review, though, it makes little practical difference for us as we would review the applicability of the exemption to these claims de novo under Rule 12(b)(6) or Rule 12(b)(1).

**A.**

In addressing the state law antitrust claims, the
Supreme Court in Flood stated:

> The petitioner's argument as to the
> application of state antitrust laws deserves
> a word.  [The District Court] rejected the
> state law claims because state antitrust
> regulation would conflict with federal policy
> and because national "uniformity (is required)
> in any regulation of baseball and its reserved
> system."  The Court of Appeals, in affirming,
> stated, "[A]s the burden on interstate
> commerce outweighs the states' interests in
> regulating baseball's reserve system, the
> Commerce Clause precludes the application here
> of state antitrust law."  As applied to
> organized baseball, and in the light of this
> Court's observations and holding in Federal
> Baseball, in Toolson, in Shubert, in
> International Boxing, and in Radovich, and
> despite baseball's allegedly inconsistent
> position taken in the past with respect to the
> application of state law, these statements
> adequately dispose of the state law claims.

407 U.S. at 284-85 (citations omitted) (first quoting Flood v.

Kuhn, 316 F. Supp. 271, 280 (S.D.N.Y. 1970); and then quoting Flood

v. Kuhn, 443 F.2d 264, 268 (2d Cir. 1971)).

As this passage shows, the Supreme Court in Flood favorably

quoted the conclusion that the court of appeals in that case had

reached based on its Commerce Clause analysis: "[A]s the burden on

interstate commerce outweighs the states' interests in regulating

baseball's reserve system, the Commerce Clause precludes the

application here of state antitrust law."  Id. (first alteration

in original) (quoting Flood, 443 F.2d at 268).  Specifically, the

court of appeals had explained that, with respect to the National and American Leagues that form MLB, "each league extends over many states, and . . . if state regulation were permissible, the internal structure of the leagues would require compliance with the strictest state antitrust standard." Flood, 443 F.2d at 268.

The court of appeals in Flood further noted that "the clubs composing the Leagues are in different cities and, for the most part, in different states" and that "the clubs cross state lines in order to make the [exhibitions] possible." Id. at 265-66. And the court of appeals in Flood concluded that "[t]he consequent extra-territorial effect of necessary compliance [with state regulation] would be considerably more far-reaching than that in Southern Pacific Co. v. Arizona," Flood, 443 F.2d at 268, which was a case in which the Supreme Court had ruled that the extra-territorial effects of state regulation were impermissible under the Commerce Clause, S. Pac. Co., 325 U.S. 761, 774-75 (1945).

That same passage from the Supreme Court's decision in Flood also shows that the Supreme Court favorably cited to the district court decision there. 407 U.S. at 284-85 (quoting Flood, 316 F. Supp. at 280). The district court in Flood, like the court of appeals in that case, had relied in relevant part on a Commerce Clause-based theory tied to the specific nature of MLB to conclude that the state law antitrust claims could not go forward. 316 F. Supp. at 280. It noted that "[s]tate and local laws may not unduly

burden interstate commerce" and that "diverse state laws here would seriously interfere" with MLB's national operations. Id. In doing so, it observed that "[t]here exist no competitive professional teams in North America outside" MLB and its minor leagues, and that "all [teams] . . . are subject to the broad powers of the Commissioner of Baseball."[6] Id. at 273. It further emphasized the "single," "unified," and "nationwide" structure of "organized baseball." Id. at 273, 279-80.

The district court in Flood also undertook a preemption-based analysis of the state law antitrust claims and relied on that analysis to dismiss them. Id. at 279. In doing so, it relied on the Supremacy Clause to hold that, because Congress had occupied the field of antitrust regulation of the "business of baseball" via the Sherman Act, the state law antitrust claims were preempted. Id.

The Supreme Court in Flood, however, cited to and quoted from only the portion of the district court's decision in that case that addressed the dismissal of the state law claims under the Commerce Clause. Flood, 407 U.S. at 284 (quoting Flood, 316 F. Supp. at 280). And, in Flood, the district court had conducted the Commerce Clause analysis under the explicit assumption that

---

[6] There are no allegations in the Complaint that concern when the League was established, but as far as we are aware, the League predates the Flood decision.

the "business of baseball" exemption "fail[s] to establish or
indicate a national policy regarding baseball sufficiently certain
to rise to the level of federal preemption."   316 F. Supp. at
279-280.

## B.

In contending that the District Court rightly dismissed
the three Puerto Rico law claims at issue, the defendants rely in
significant part on the Eleventh Circuit's decision in Crist.  They
emphasize that Crist determined that "[a] careful reading" of the
passage quoted above from Flood "yields two different theories"
for why the state antitrust claims in that case had to be
dismissed.  331 F.3d at 1185.

Crist first concluded that the Supreme Court's reliance
in Flood on the "statement" of the district court in that case
supported "a preemption theory."  Id.  Crist then concluded that
the Supreme Court's reliance in Flood on the "statement" of the
court of appeals in that case supported a Commerce Clause-based
theory.  Id.

Under the "preemption theory," Crist concluded that
"federal antitrust policy . . . precludes the application of state
antitrust law to the business of baseball."  Id. at 1185 n.19.
Accordingly, Crist held that the state law claims at issue there
had to be dismissed because those claims alleged violations of

state law based on conduct that constituted the "business of baseball." Id. at 1185-86.

Were we to understand Flood as Crist understood it, we would be obliged to affirm the District Court's dismissal of the Puerto Rico law antitrust and fair competition claims here. Those three claims, like the state law antitrust claims in Crist, allege violations of law based on conduct that constitutes the "business of baseball."

We do not see, however, how the "statement" from the district court in Flood on which the Supreme Court relied in that case supports "a preemption theory." As our earlier analysis of that "statement" explained, the Court there adopted the reasoning of the lower courts that concluded that the state law antitrust claims were prohibited under the Commerce Clause because state regulation of conduct that would constitute the "business of baseball" -- the MLB's enforcement of the reserve clause -- in relation to an interstate professional baseball league would impose impermissible burdens on interstate commerce.

Indeed, if the Court in Flood did rely on the "preemption theory," then we see little reason for it to have referenced the Commerce Clause or to have embraced an analysis under that constitutional provision, as it unmistakably did. See Flood, 407 U.S. at 284. In addition, the Sherman Act normally coexists with -- rather than displaces -- state antitrust regulation, see

California v. ARC Am. Corp., 490 U.S. 93, 101 (1989), as the
defendants acknowledge.

True, the Supreme Court acknowledged in Flood that the
district court there also found that "state antitrust regulation
would conflict with federal policy." 407 U.S. at 284. True, too,
the district court engaged in an analysis of field preemption.
Flood, 316 F. Supp. at 280. But Flood quoted from and cited to
only the portion of the district court decision that addressed the
viability of the state law claims under the Commerce Clause. 407
U.S. at 284 (quoting Flood, 316 F. Supp. at 280). So, we do not
see how the Supreme Court's reliance in Flood on the district
court's rationale in that case shows that the Supreme Court adopted
a theory of field preemption as to all claims alleging a state
antitrust law violation based on conduct that constitutes the
"business of baseball."

We are aware that the Supreme Court in Flood dismissed
the state law claims "in light of th[e Supreme] Court's
observations and holding in Federal Baseball, in Toolson, in
Shubert, in International Boxing, and in Radovich." Id. But this
feature of the Supreme Court's decision in Flood does not alter
our view that the Court based its conclusion that the state-law
antitrust claims in that case had to be dismissed based on the
Commerce Clause rather than Congress having occupied the field

through the Sherman Act and thereby having preempted state antitrust laws from applying to the "business of baseball."

In referencing its "observations and holdings" in the line of cases starting with Federal Baseball, the Supreme Court is best read to have been reinforcing the conclusion that the "business of baseball" exemption does not "creat[e] a mere vacuum in national policy, leaving the states free to regulate the membership of the baseball leagues," Flood, 316 F. Supp. at 279 (quoting State v. Milwaukee Braves, Inc., 144 N.W.2d 1, 17-18 (Wis. 1966)). Accordingly, to the extent that Flood invoked its Sherman Act line of cases in rejecting the state law antitrust claims, it appears to us that it did so only after it concluded that enforcement of state antitrust regimes as to the conduct at issue would substantially burden interstate commerce. It thus appears to have invoked that line of cases only for the purpose of confirming that Congress had not authorized states to impose those burdens. See S. Pac. Co., 325 U.S. at 769 ("Congress has undoubted power to . . . . permit the states to regulate [interstate] commerce in a manner which would otherwise not be permissible [under the Commerce Clause].").

Of course, the Court held in Flood that the state antitrust claims there were barred because state regulation of conduct that would constitute the "business of baseball" -- the MLB's enforcement of the reserve clause -- in relation to an

interstate professional baseball league would impose impermissible burdens on interstate commerce.  It did not address the distinct question of whether there would be any basis for prohibiting a state law antitrust or related claim -- even if targeting conduct that would constitute the "business of baseball" -- brought against a professional baseball league that, like the League, has franchises located solely within a single state or territory.[7]

The defendants do contend that the Commerce Clause nonetheless "prohibits the application of state antitrust laws not only in baseball . . . but also in other professional sports." They rely for this contention on Robertson v. National Basketball Association, 389 F. Supp. 867, 880 (S.D.N.Y. 1975).  That case concerned state antitrust claims against the National Basketball Association ("NBA") that the district court dismissed based on what it deemed to be the "unquestionably applicable and controlling" court of appeals' decision in Flood.  Id.

---

[7] "We readily acknowledge," as the court of appeals did in Flood, the tension inherent in a ruling that the "business of baseball" exemption to federal antitrust scrutiny precludes some state regulation.  See 443 F.2d at 268.  On the one hand, the exemption has its roots in a determination that baseball is not interstate commerce.  Fed. Baseball, 259 U.S. at 208-09.  Yet that same exemption may now preclude some state regulation because a state thereby may impermissibly burden interstate commerce under the modern interpretation of the Commerce Clause.  See Flood, 443 F.2d at 268 (explaining that "we are bound by [Federal Baseball], while in our disposition of the state and common law counts, we must of necessity decide this question . . . by present Commerce Clause standards and not the standards applicable in 1922").

- 48 -

In following that intermediate appellate decision in Flood, however, Robertson did not adopt a per se rule against state antitrust regulation of sports leagues. Id. It noted that "[w]hen Flood was decided, [MLB] had 24 teams operating in 24 'home' cities with the teams divided into two leagues. NBA has 18 teams operating in 18 'home' cities, and those teams are divided into two conferences." Id. at 881. It also indicated that the parties agreed that "professional basketball involves substantial volumes of interstate trade and commerce." Id.

Thus, Robertson comports with our conclusion that Flood requires a Commerce Clause analysis of the particular league at issue in the case. It also comports with our conclusion that the Commerce Clause analysis in Flood rested in significant part on the geographic distribution of the teams involved in the league at issue in that case.

### c.

In sum, we do not agree that, because the conduct alleged to violate Puerto Rico's antitrust and fair competition laws constitutes the "business of baseball," it follows necessarily that the claims under Puerto Rico antitrust and fair competition laws must be dismissed as preempted under the Supremacy Clause. The question remains, though, whether the application of the Puerto Rico antitrust and fair competition laws to restrain the

defendants' alleged conduct would impermissibly burden interstate commerce.

In this case, those Puerto Rico laws would be applied to a professional baseball league that -- unlike the interstate MLB -- has franchises that are located solely within Puerto Rico and thus that does not "extend[] over many states," 443 F.2d at 268. Flood, however, does not make clear whether state antitrust regulation of a league operating within a state or territory could be said to impose an impermissible burden on state commerce. Accordingly, we vacate the portion of the District Court's ruling that dismisses the Puerto Rico law antitrust and fair competition claims and remand so that the District Court may consider whether those claims are precluded by the Commerce Clause. In doing so, the District Court may consider the parties' arguments as to this issue, as well as any issues of waiver.

## V.

We also must address the plaintiffs' challenge to the District Court's judgment that their § 1983 claim "must be dismissed under the doctrine of res judicata." (Citation modified). With this claim, the plaintiffs allege that the defendants, "acting in concert with the mayor of the Municipality of San Juan, operated under the law and color of government authority in depriving [the plaintiffs] of their property interests in the Cangrejeros Franchise without due process of law."

As a reminder, the District Court ruled that, under Puerto Rico law, the § 1983 claim was precluded by the prior judgment that the San Juan Superior Court issued against Axon after he challenged his temporary suspension from the League in that Commonwealth Court. We agree with the plaintiffs that this ruling cannot stand.

**A.**

The plaintiffs contend, in part, that the District Court's ruling must be reversed because, although Puerto Rico law requires perfect identity between the parties and between the causes of action of the two suits for res judicata to apply, there was not perfect identity between the two suits at issue. The plaintiffs recognize that P.R. Laws Ann. tit. 31, § 3343, the law on which the District Court relied for its res judicata analysis, was repealed in November 2020 and so before the conduct in this case took place. They also recognize that, as the defendants explain, "[t]he 2020 edition of the Puerto Rico Civil [Code]," which by its enactment replaced and repealed § 3343, "does not contain the requirements that existed under the 1930 Civil Code" and that "the requirements set forth in the old Civil Code no longer apply."

The plaintiffs nonetheless contend that "[i]n the district court, [the defendants] relied on case law applying § 3343" and so "cannot now renounce their position" on appeal. They also point out that the defendants "do not identify how the

tests for res judicata have purportedly been changed by the 2020 Puerto Rico Civil Code or what those new tests are" and "do not cite a single case setting forth any new test."  And, finally they maintain that the same test for res judicata that § 3343 required -- "the most perfect identity between the things, causes, and persons of the litigant," P.R. Laws Ann. tit. 31, § 3343 -- still "lives on in the common law."  In support of this contention, they point to Santiago Ruiz v. Municipio de San Juan, No. SJ2023CV01413, 2023 WL 8615779, at *2-3 (P.R. Cir. Nov. 28, 2023); García-Navarro v. Hogar La Bella Unión, Inc., No. 3:17-cv-01271, 2022 WL 11266460, at *33 (D.P.R. Oct. 18, 2022); and HibiscusPR 322, LLC v. Lorenzo, No. CV 19-1854, 2021 WL 8993846, at *8 (D.P.R. June 10, 2021).

The plaintiffs did not themselves alert the District Court to the fact that § 3343 was not operative at the time that the District Court ruled on the defendants' motion to dismiss based on that measure.  Ordinarily, we do not permit parties on appeal to raise issues that they failed to raise below.  See, e.g., Camara de Mercadeo, Industria y Distribucion de Alimentos, Inc. v. Emanuelli-Hernandez, 72 F.4th 361, 365 (1st Cir. 2023).  However, the defendants do not identify the plaintiffs' failure to point out to the District Court that § 3343 was no longer the law as a ground for affirming the District Court's ruling.  To the contrary, they concede that the measure in question was not operative at the

time of the District Court's ruling, and they make no argument that, under § 3343, the District Court correctly concluded that res judicata applied.

In addition, it is not evident that the District Court did correctly apply § 3343. As the plaintiffs point out, neither the parties nor the cause of action were identical between the prior suit and this suit, and § 3343 appears to require "perfect identity" in those elements across the two cases. P.R. Laws Ann. tit. 31, § 3343.

In such circumstances, we see no reason to let the District Court's ruling stand based on a statute that it is agreed by both parties was not operative at the time that the District Court relied on it and that the District Court appears to have misapplied in any event. We thus cannot affirm the District Court's ruling insofar as it rests on § 3343.

**B.**

Seemingly cognizant of the difficulties presented by dismissing the § 1983 claims based on § 3343, the defendants urge us to affirm the District Court's judgment on alternative grounds, as we may, see Brox, 83 F.4th at 98. Neither alternative ground has merit.

**1.**

The defendants first contend that the plaintiffs forfeited their challenge to the District Court's ruling that

determined that the § 1983 claim was precluded by failing to raise
it below.  They acknowledge that the plaintiffs did argue "that
res judicata does not bar the present action," but they contend
this argument related to the case as a whole and not to the § 1983
claim specifically.  We are not persuaded.

It is unsurprising that the plaintiffs responded to the
defendants' motion to dismiss on grounds of res judicata in the
categorical fashion that they did.  The defendants themselves
contended to the District Court only that the entire action was
barred on res judicata grounds, and they did so without making any
more particularized assertion about the § 1983 claim.

In any event, the plaintiffs did assert the argument
that they now advance about the parties and causes of actions not
being identical between the current and prior suits.  Specifically,
they argued to the District Court, among other things, that the
"[p]laintiffs' claims do not share a perfect identity of thing or
cause with the prior state court action" and that the "plaintiffs'
claims do not share a perfect identity of parties with those in
the Superior Court action."  (Citation modified).

**2.**

The defendants also assert that we may affirm the
District Court's ruling dismissing the § 1983 claim on grounds of
issue preclusion, even if res judicata does not apply.  But the
defendants did not assert this ground for dismissing the claims

below, so we decline to consider it now.  See In re Fin. Oversight & Mgmt. Bd., 16 F.4th 954, 962 (1st Cir. 2021) ("It is a well-settled principle in this circuit that a party may not raise on appeal issues that were not seasonably advanced (and, hence, preserved) below." (citation modified) (quoting Toren v. Toren, 191 F.3d 23, 29 (1st Cir. 1999)).

**3.**

In sum, the sole ground that the District Court gave for dismissing the plaintiffs' § 1983 claim is the sole one that the defendants advanced but that they themselves no longer defend. That ground rests, however, on a law that was not operative at the time that the District Court relied on it to dismiss the claim. Accordingly, we reverse the District Court's dismissal of the plaintiffs' § 1983 claim.

**VI.**

In consequence of our ruling as to the § 1983 claim, a federal claim remains in the plaintiffs' case.  The authority of the District Court to dismiss the remaining Puerto Rico law claim, however, kicks in only if all federal claims have been dismissed, at least given that none of the other bases for dismissal identified in 28 U.S.C. § 1367(c) are presented on appeal as grounds for affirming that claim's dismissal.  See 28 U.S.C. § 1367(c).  We thus reverse the District Court's dismissal of the remaining Puerto Rico law claim as well.

## VII.

For the foregoing reasons, we **<u>affirm</u>** the District Court's grant of the motion to dismiss with regard to the federal antitrust claims. We **<u>vacate</u>** the District Court's grant of the motion to dismiss with regard to the claims brought under Puerto Rico's antitrust and fair competition laws. We **<u>reverse</u>** the District Court's grant of the motion to dismiss with regard to the claim brought under the federal civil rights statute. We also **<u>reverse</u>** the District Court's dismissal of the remaining claim brought under Puerto Rico law. The parties shall bear their own costs.